TYMKOVICH, Circuit Judge.
This case requires us to determine whether the Religious Freedom Restoration Act and the Free Exercise Clause protect the plaintiffs — two companies and their owners who run their businesses to reflect their religious values. The companies are Hobby Lobby, a craft store chain, and Mardel, a Christian bookstore chain. Their owners, the Greens, run both companies as closely held family businesses and operate them according to a set of Christian principles. They contend regulations implementing the 2010 Patient Protection and Affordable Care Act force them to violate their sincerely held religious beliefs. In particular, the plaintiffs brought an action challenging a regulation that requires them, beginning July 1, 2013, to provide certain contraceptive services as a part of their employer-sponsored health care plan. Among these services are drugs and devices that the plaintiffs be *1121 lieve to be abortifacients, the use of which is contrary to their faith.
We hold that Hobby Lobby and Mardel are entitled to bring claims under RFRA, have established a likelihood of success that their rights under this statute are substantially burdened by the contraceptive-coverage requirement, and have established an irreparable harm. But we remand the case to the district court for further proceedings on two of the remaining factors governing the grant or denial of a preliminary injunction.
More specifically, the court rules as follows:
As to jurisdictional matters, the court unanimously holds that Hobby Lobby and Mardel have Article III standing to sue and that the Anti-Injunction Act does not apply to this ease. Three judges (Kelly, Tymkovich, and Gorsuch, JJ.) would also find that the Anti-Injunction Act is not jurisdictional and the government has forfeited reliance on this statute. These three judges would also hold that the Greens have standing to bring RFRA and Free Exercise claims and that a preliminary injunction should be granted on their RFRA claim. A fourth judge (Matheson, J.) would hold that the Greens have standing and would remand for further consideration of their request for a preliminary injunction on their RFRA claim.
Concerning the merits, a majority of five judges (Kelly, Hartz, Tymkovich, Gorsuch, and Bacharach, JJ.) holds that the district court erred in concluding Hobby Lobby and Mardel had not demonstrated a likelihood of success on their RFRA claim. Three judges (Briscoe, C.J., and Lucero and Matheson, JJ.) disagree and would affirm the district court on this question.
A majority of five judges (Kelly, Hartz, Tymkovich, Gorsuch, and Bacharach, JJ.) further holds that Hobby Lobby and Mardel satisfy the irreparable harm prong of the preliminary injunction standard. A four-judge plurality (Kelly, Hartz, Tymkovich, Gorsuch, JJ.) would resolve the other two preliminary injunction factors (balance of equities and public interest) in Hobby Lobby and Mardel’s favor and remand with instructions to enter a preliminary injunction, but the court lacks a majority to do so. Instead, the court remands to the district court for further evaluation of the two remaining preliminary injunction factors.[1]
One judge (Matheson, J.) reaches the merits of the plaintiffs’ constitutional claim under the Free Exercise Clause, concluding that it does not entitle the plaintiffs to preliminary injunctive relief.[2]
Accordingly, for the reasons set forth below and exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we reverse the district court’s denial of the plaintiffs’ motion for a *1122 preliminary injunction and remand with instructions that the district court address the remaining two preliminary injunction factors and then assess whether to grant or deny the plaintiffs’ motion.
I. Background & Procedural History

A. The Plaintiffs

The plaintiffs in this case are David and Barbara Green, their three children (Steve Green, Mart Green, and Darsee Lett), and the businesses they collectively own and operate: Hobby Lobby Stores, Inc. and Mardel, Inc. David Green is the founder of Hobby Lobby, an arts and crafts chain with over 500 stores and about 13,000 full-time employees. Hobby Lobby is a closely held family business organized as an S-corp. Steve Green is president of Hobby Lobby, and his siblings occupy various positions on the Hobby Lobby board. Mart Green is the founder and CEO of Mardel, an affiliated chain of thirty-five Christian bookstores with just under 400 employees, also run on a for-profit basis.
. As owners and operators of both Hobby Lobby and Mardel, the Greens have organized their businesses with express religious principles in mind. For example, Hobby Lobby’s statement of purpose recites the Greens’ commitment to “[hjonoring the Lord in all we do by operating the company in a manner consistent with Biblical principles.” JA 22-23a. Similarly, Mardel, which sells exclusively Christian books and materials, describes itself as “a faith-based company dedicated to renewing minds and transforming lives through the products we sell and the ministries we support.” JA 25a.
Furthermore, the Greens allow their faith to guide business decisions for both companies. For example, Hobby Lobby and Mardel stores are not open on Sundays; Hobby Lobby buys hundreds of full-page newspaper ads inviting people to “know Jesus as Lord and Savior,” JA 24a; and Hobby Lobby refuses to engage in business activities that facilitate or promote alcohol use.
The Greens operate Hobby Lobby and Mardel through a management trust (of which each Green is a trustee), and that trust is likewise governed by religious principles. The trust exists “to honor God with all that has been entrusted” to the Greens and to “use the Green family assets to create, support, and leverage the efforts of Christian ministries.” JA 21a. The trustees must sign “a Trust Commitment,” which among other things requires them to affirm the Green family statement of faith and to “regularly seek to maintain a close intimate walk with the Lord Jesus Christ by regularly investing time in His Word and prayer.” Id.
As is particularly relevant to this case, one aspect of the Greens’ religious commitment is a belief that human life begins when sperm fertilizes an egg. In addition, the Greens believe it is immoral for them to facilitate any act that causes the death of a human embryo.

B. The Contraceptive-Coverage Requirement

Under the Patient Protection and Affordable Care Act (ACA), employment-based group health plans covered by the Employee Retirement Income Security Act (ERISA) must provide certain types of preventive health services. See 42 U.S.C. § 300gg-13; 29 U.S.C. § 1185d. One provision mandates coverage, without cost-sharing by plan participants or beneficiaries, of “preventive care and screenings” for women “as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA].” 42 U.S.C. § 300gg-13(a)(4). HRSA is an agency within the Department of Health and Human Services (HHS).
*1123 When the ACA was enacted, there were no HRSA guidelines related to preventive care and screening for women. As a result, HHS asked the Institute of Medicine (an arm of the National Academy of Sciences) to develop recommendations to help implement these requirements. In response, the Institute issued a report recommending, among other things, that the guidelines require coverage for “ ‘[a]ll Food and Drug Administration [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity,’ as prescribed by a provider.” 77 Fed.Reg. 8725, 8725 (Feb. 15, 2012).
HRSA and HHS adopted this recommendation, meaning that employment-based group health plans covered by ERISA now must include FDA-approved contraceptive methods. The FDA has approved twenty such methods, ranging from oral contraceptives to surgical sterilization. Four of the twenty approved methods— two types of intrauterine devices (IUDs) and the emergency contraceptives commonly known as Plan B and Ella — can function by preventing the implantation of a fertilized egg. The remaining methods function by preventing fertilization.[3]

C. Exemptions from the Contraceptive-Coverage Requirement

A number of entities are partially or fully exempted from the contraceptive-coverage requirement.
First, HHS “may establish exemptions” for “group health plans established or maintained by religious employers and health insurance coverage provided in connection with group health plans established or maintained by religious employers with respect to any requirement to cover contraceptive services.... ” 45 C.F.R. § 147.130(a)(l)(iv)(A).
HHS regulations currently define a “religious employer” as an organization that: (1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in a provision of the Internal Revenue Code that refers to churches, their integrated auxiliaries, conventions or associations of churches, and to the exclusively religious activities of any religious order. See 45 C.F.R. § 147.130(a)(l)(iv)(B).
This definition of religious employer might change, however, as the federal *1124 agencies responsible for implementing the preventive services portion of the ACA have proposed a new rule that would eliminate the first three requirements above and clarify that the exemption is available to all non-profit organizations falling within the scope of a certain Internal Revenue Code provision. See 78 Fed.Reg. 8456, 8461 (Feb. 6, 2013).
Second, the government has proposed an accommodation for certain other nonprofit organizations, including religious institutions of higher education, that have maintained religious objections to contraceptive coverage yet will not fall within the amended definition of a religious employer. Many of these organizations are currently subject to a temporary “safe harbor” provision that temporarily exempts them from having to cover contraceptive services. The government has proposed to route the contraceptive coverage for these organizations through a middleman insurer or insurance plan administrator, allowing the organizations to avoid directly providing contraceptive coverage. See id. at 8458-68.
Third, if a business does not make certain significant changes to its health plans after the ACA’s effective date, those plans are considered “grandfathered” and are exempt from the contraceptive-coverage requirement. See 42 U.S.C. § 18011(a)(2). Grandfathered plans may remain so indefinitely.
Fourth, businesses with fewer than fifty employees are not required to participate in employer-sponsored health plans. See, e.g., 26 U.S.C. § 4980H. To the extent these businesses do not offer a health plan, they do not have to comply with any aspect of the shared responsibility health coverage requirements, including the contraceptive-coverage requirement. At the same time, the government asserts that if an otherwise exempt small business offers a health plan, it must comply with the contraceptive-coverage requirement. See Aple. Br. at 39 (citing 42 U.S.C. § 300gg-13).
Relying on information released by the White House and HHS, the plaintiffs estimate that at least 50 million people, and perhaps over a 100 million, are covered by exempt health plans. JA 80a. The government argues that the number of grandfathered health plans will decline over time, that grandfathered plans may already cover the objected-to contraceptives, and that financial incentives exist to push small businesses into the health insurance market, in which case they would have to comply with the contraceptive-coverage requirement. At the same time, the government has not offered contrary estimates of individuals covered by exempt health plans.
No exemption, proposed or otherwise, would extend to for-profit organizations like Hobby Lobby or Mardel. And the various government agencies responsible for implementing the exceptions to the contraceptive-coverage requirement have announced that no proposed exemption will extend to for-profit entities under any circumstances because of what the government considers an important distinction, discussed further below, between for-profit and non-profit status.

D. The Expected Effect of the Contraceptive-Coverage Requirement

The Greens run the Hobby Lobby health plan, a self-insured plan, which provides insurance to both Hobby Lobby and Mardel employees. Hobby Lobby and Mardel cannot qualify for the “grandfathered” status exemption because they elected not to maintain grandfathered status prior to the date that the contraceptive-coverage requirement was proposed.
Nevertheless, the Greens object to providing coverage for any FDA-approved *1125 contraceptives that would prevent implantation of a fertilized egg. Because the Greens believe that human life begins at conception, they also believe that they would be facilitating harms against human beings if the Hobby Lobby health plan provided coverage for the four FDA-approved contraceptive methods that prevent uterine implantation (Ella, Plan B, and the two IUDs). The government does not dispute the sincerity of this belief.
The Greens present no objection to providing coverage for the sixteen remaining contraceptive methods. In other words, the Greens are willing to cover, without cost-sharing, the majority of FDA-approved contraceptive methods, from the original birth control pill to surgical sterilization. But if Hobby Lobby or Mardel employees wish to obtain Ella, Plan B, or IUDs, the Greens object to being forced to provide such coverage.
According to the plaintiffs, the corporations’ deadline to comply with the contraceptive-coverage requirement is July 1, 2013. If the Hobby Lobby health plan does not cover all twenty contraceptive methods by that date, the businesses will be exposed to immediate tax penalties, potential regulatory action, and possible private lawsuits. See, e.g., 26 U.S.C. §§ 4980D, 4980H; 29 U.S.C. §§ 1132, 1185d.
The most immediate consequence for Hobby Lobby and Mardel would come in the form of regulatory taxes: $100 per day for each “individual to whom such failure relates.” 26 U.S.C. § 4980D(b)(l). The plaintiffs assert that because more than 13,000 individuals are insured under the Hobby Lobby plan (which includes Mardel), this fíne would total at least $1.3 million per day, or almost $475 million per year. This assumes that “individual” means each individual insured under Hobby Lobby’s plan. If the corporations instead drop employee health insurance altogether, they will face penalties of $26 million per year. See id. § 4980H.

E. Procedural History

The plaintiffs filed suit on September 12, 2012, challenging the contraceptive-coverage requirement under RFRA, the Free Exercise Clause of the First Amendment, and the Administrative Procedure Act. The plaintiffs simultaneously moved for a preliminary injunction on the basis of their RFRA and Free Exercise claims. The district court denied that motion. See Hobby Lobby Stores, Inc. v. Sebelius, 870 F.Supp.2d 1278 (W.D.Okla.2012).
The plaintiffs then appealed the denial of the preliminary injunction and moved for injunctive relief pending appeal. A two-judge panel denied relief pending appeal, adopting substantially the same reasoning as the district court. See Hobby Lobby Stores, Inc. v. Sebelius, No. 12-6294, 2012 WL 6930302 (10th Cir. Dec. 20, 2012). The plaintiffs then sought emergency relief under the All Writs Act from the Supreme Court, which also denied relief. See Hobby Lobby Stores, Inc. v. Sebelius, — U.S. —, 133 S.Ct. 641, 184 L.Ed.2d 448 (2012) (Sotomayor, J., in chambers).
The plaintiffs subsequently moved for initial en banc consideration of this appeal, citing the exceptional importance of the questions presented. We granted that motion. And given Hobby Lobby and Mardel’s July 1 deadline for complying with the contraceptive-coverage requirement, we granted the plaintiffs’ motion to expedite consideration of this appeal.
II. The Religious Freedom Restoration Act
Hobby Lobby and Mardel’s central claims here arise under the Religious Freedom Restoration Act. A plaintiff makes a prima facie case under RFRA by *1126 showing that the government substantially burdens a sincere religious exercise. Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir.2001). The burden then shifts to the government to show that the “compelling interest test is satisfied through application of the challenged law ‘to the person’'— the particular claimant whose sincere exercise of religion is being substantially burdened.” Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 420, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (quoting 42 U.S.C. § 2000bb-l(b)). This burden-shifting approach applies even at the preliminary injunction stage. Id. at 429,126 S.Ct. 1211.
The principal questions we must resolve here include: (1) whether Hobby Lobby and Mardel are “persons” exercising religion for purposes of RFRA; (2) if so, whether the corporations’ religious exercise is substantially burdened; and (3) if there is a substantial burden, whether the government can demonstrate a narrowly tailored compelling government interest.
III. Subject-Matter Jurisdiction
Before turning to the preliminary injunction standard, we must resolve two issues that bear on our subject-matter jurisdiction—standing and the Anti-Injunction Act.

A. Standing

We begin by examining whether Hobby Lobby and Mardel have standing to sue in federal court. Article III of the Constitution limits federal judicial power to “Cases” and “Controversies.” A party that cannot present a case or controversy within the meaning of Article III does not have standing to sue in federal court. And whenever standing is unclear, we must consider it sua sponte to ensure there is an Article III case or controversy before us. See New Eng. Health Care Emp. Pension Fund v. Woodruff, 512 F.3d 1283, 1288 (10th Cir.2008).
Under the familiar three-part test for establishing Article III standing, a plaintiff must show an injury that is “[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.” Clapper v. Amnesty Int’l USA, — U.S. —, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (internal quotation marks omitted).
We conclude that Hobby Lobby and Mardel have Article III standing. Both companies face an imminent loss of money, traceable to the contraceptive-coverage requirement. Both would receive redress if a court holds the contraceptive-coverage requirement unenforceable as to them. Both therefore have Article III standing.[4]

B. The Anti-Injunction Act

A second possible impediment to our subject-matter jurisdiction is the Anti-Injunction Act (AIA). See 26 U.S.C. § 7421. Although the plaintiffs and the government agree that the AIA does not apply here, “subject-matter jurisdiction, because it involves a court’s power to hear a case, can never be forfeited or waived.” Arbaugh v. Y & H Corp., 546 U.S. 500, *1127 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (internal quotation marks omitted). We therefore have an independent duty to determine whether the AIA strips us of subject-matter jurisdiction. Id.
The AIA dictates, with statutory exceptions inapplicable to this case, that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.” 26 U.S.C. § 7421(a). As the Supreme Court recently noted, the AIA “protects the Government’s ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes.” NFIB v. Sebelius, — U.S. —, 132 S.Ct. 2566, 2582, 183 L.Ed.2d 450 (2012).
In this case, the corporations’ challenge relates to the government’s authority under 26 U.S.C. § 4980D, which imposes a “tax” on any employer that does not meet the ACA’s health insurance requirements, including the contraceptive-coverage requirement. Id. § 4980D(a). As noted above, the “tax” is set at $100 “for each day in the noncompliance period with respect to each individual to whom such failure relates.” Id. § 4980D(b)(l). If an employer fails to provide health insurance, the employer is subject to a tax under § 4980H. And, as the Supreme Court recently instructed, when Congress uses the term “tax,” it is a strong indication that Congress intends the AIA to apply. NFIB, 132 S.Ct. at 2582 (2012).
Still, the AIA does not apply to every lawsuit “tangentially related to taxes,” Cohen v. United States, 650 F.3d 717, 727 (D.C.Cir.2011) (en banc), and the corporations’ suit is not challenging the IRS’s ability to collect taxes. Rather, they seek to enjoin the enforcement of one HHS regulation, 45 C.F.R. § 147.130, which requires Hobby Lobby and Mardel to provide their employees with health plans that include “preventive care ... provided for in [the] ... [HRSA] guidelines,” id. § 147.130(a)(l)(iv), which in turn “require coverage, without cost sharing, for ‘[a]ll [FDA-]approved contraceptive methods,’” 77 Fed.Reg. at 8726 (Feb. 15, 2012). In other words, Hobby Lobby and Mardel are not seeking to enjoin the collection of taxes or the execution of any IRS regulation; they are seeking to enjoin the enforcement, by whatever method, of one HHS regulation that they claim violates their RFRA rights.
Indeed, a regulatory tax is just one of many collateral consequences that can result from a failure to comply with the contraceptive-coverage requirement. See, e.g., 29 U.S.C. § 1132(a)(5) (authorizing the Secretary of Labor to enforce the contraceptive-coverage requirement against non-compliant insurers); 42 U.S.C. § 300gg-22(a)(2) (authorizing the Secretary of HHS to exact penalties against non-compliant insurers in states where the state government does not enforce the health insurance requirements).
And just as the AIA does not apply to any suit against the individual mandate, which is enforced by the IRS, see NFIB, 132 S.Ct. at 2584, so too does the AIA not apply to any suit against the contraceptive-coverage requirement, even though it also may be enforced by the IRS. The statutory scheme makes clear that the tax at issue here is no more than a penalty for violating regulations related to health care and employer-provided insurance, see, e.g., 42 U.S.C. § 300gg-22(b)(2)(C)(i) (calculating the maximum “penalty” that the Secretary of HHS can impose on non-compliant insurers in the same way that 26 U.S.C. § 4980D(b)(l) calculates the “tax” for non-compliant employers, namely “$100 for each day for each individual with respect to which such a failure occurs”), and *1128 the AIA does not apply to “the exaction of a purely regulatory tax,” Robertson v. United States, 582 F.2d 1126, 1127 (7th Cir.1978).
Both sides agree that the AIA should not apply for essentially these same reasons. We are convinced by this reasoning and proceed to resolve the merits of the RFRA claim.
IV. Preliminary Injunction Standard
As noted above, the district court denied Hobby Lobby and Mardel’s request for preliminary injunctive relief. We review the denial of a preliminary injunction for abuse of discretion. Little v. Jones, 607 F.3d 1245, 1250 (10th Cir.2010). A district court abuses its discretion by denying a preliminary injunction based on an error of law. Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir.2009).
Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest. See, e.g., Winter v. NRDC, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
Hobby Lobby and Mardel urge that we apply a relaxed standard under which it can meet its burden for a preliminary injunction by showing the second, third, and fourth factors “tip strongly in [its] favor,” and then satisfy the first factor “by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.” Okla. ex rel. Okla. Tax Comm’n v. Int’l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir.2006). But we need not resolve whether this relaxed standard would apply here, given that a majority of the court holds that Hobby Lobby and Mardel have satisfied the likelihood-of-success prong under the traditional standard.
The district court ruled that the corporations failed the likelihood-of-success element because even closely held family businesses like Hobby Lobby and Mardel are not protected by RFRA.
We disagree with this conclusion and determine that the contraceptive-coverage requirement substantially burdens Hobby Lobby and Mardel’s rights under RFRA. And at this stage, the government has not shown a narrowly tailored compelling interest to justify this burden.
V. Merits

A. Hobby Lobby and Mardel Are “Persons Exercising Religion” Under RFRA

RFRA provides, as a general rule, that the “Government shall not substantially burden a person’s exercise of religion.” 42 U.S.C. § 2000bb-l(a) (emphasis added). The parties dispute whether for-profit corporations, such as Hobby Lobby and Mardel, are persons exercising religion for purposes of RFRA. We thus turn to the question of whether Hobby Lobby, as a family owned business furthering its religious mission, and Mardel, as a Christian bookstore, can take advantage of RFRA’s protections.
The government makes two arguments for why this is not the case. First, it cites to civil rights statutes and labor laws that create an exemption for religious organizations. It then references case law suggesting that non-profit status is an objective criterion for determining whether an entity is a religious organization for purposes of these civil rights statutes and labor laws. The government therefore argues that, as a matter of statutory interpretation, RFRA should be read to carry forward the supposedly preexisting distinc *1129 tion between non-profit, religious corporations and for-profit, secular corporations. Second, the government asserts that the for-profit/non-profit distinction is rooted in the Free Exercise Clause. It suggests Congress did not intend RFRA to expand the scope of the Free Exercise Clause. The government therefore concludes RFRA does not extend to for-profit corporations.
We reject both of these arguments. First, we hold as a matter of statutory interpretation that Congress did not exclude for-profit corporations from RFRA’s protections. Such corporations can be “persons” exercising religion for purposes of the statute.[5] Second, as a matter of constitutional law, Free Exercise rights may extend to some for-profit organizations.

1. Statutory Interpretation

a. The Dictionary Act

We begin with the statutory text. RFRA contains no special definition of “person.” Thus, our first resource in determining what Congress meant by “person” in RFRA is the Dictionary Act, which instructs: “In determining the meaning of any Act of Congress, unless the context indicates otherwise * * * the word[ ] ‘person’ ... include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.” 1 U.S.C. § 1. Thus, we could end the matter here since the plain language of the text encompasses “corporations,” including ones like Hobby Lobby and Mardel.
In addition, the Supreme Court has affirmed the RFRA rights of corporate claimants, notwithstanding the claimants’ decision to use the corporate form. See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 973 (10th Cir.2004) (en banc) (affirming a RFRA claim brought by “a New Mexico corporation on its own behalf’), aff'd, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006).[6]

b. Other Statutes

Given that no one disputes at least some types of corporate entities can bring RFRA claims, the next question is whether Congress intended to exclude for-profit corporations, as opposed to non-profit corporations, from RFRA’s scope. Notably, neither the Dictionary Act nor RFRA explicitly distinguishes between for-profit and non-profit corporations; the Dictionary Act merely instructs that the term “persons” includes corporations.
At the same time, we acknowledge the Dictionary Act definition does not apply if *1130 “the context indicates otherwise.” 1 U.S.C. § 1. Generally, “context” here “means the text of the Act of Congress surrounding the word at issue, or the text of other related congressional Acts.” Rowland v. Cal. Men’s Colony, 506 U.S. 194, 199, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). The government contends that RFRA’s “context” points to exemptions for religious employers in other statutes, and in particular it directs us to the religious exemptions contained in Title VII, the Americans with Disabilities Act (ADA), and the National Labor Relations Act (NLRA). But rather than providing contextual support for excluding for-profit corporations from RFRA, we think these exemptions show that Congress knows how to craft a corporate religious exemption, but chose not to do so in RFRA.
Under Title VII, for example, the prohibition on discrimination on the basis of religion does not apply to an employer that is “a religious corporation, association, educational institution, or society.” 42 U.S.C. § 2000e-l(a). The ADA contains similar language. See id. § 12113(d)(1), (2). The government also notes that the Supreme Court has construed the NLRA to remove the National Labor Relations Board’s jurisdiction over schools operated by churches. See NLRB v. Catholic Bishop, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).[7]
The government argues that in enacting RFRA against the backdrop of these statutes, Congress “carried forward [a] distinction between non-profit, religious organizations and for-profit, secular companies.’ ” Aple. Br. at 16. In short, the government believes Congress used “person” in RFRA as extreme shorthand for something like “natural person or ‘religious organization’ as that term was used in exemptions for religious organizations as set forth in Title VII, the ADA, and the NLRA.”
This reading strikes us as strained. Indeed, the exemptions present in Title VII, the ADA, and the NLRA suggest the opposite inference from what the government draws. Rather than implying that similar narrowing constructions should be imported into statutes that do not contain such language, they imply Congress is quite capable of narrowing the scope of a statutory entitlement or affording a type of statutory exemption when it wants to. The corollary to this rule, of course, is that when the exemptions are not present, it is not that they are “carried forward” but rather that they do not apply. Cf. Chickasaw Nation v. United States, 208 F.3d 871, 880 (10th Cir.2000) (holding, in light of the fact that Congress had created a number of other tax exemptions for Indian tribes, “[i]f Congress wishes to exempt Indian tribes from excise taxes that otherwise might be reasonably construed as applying to them, it should do so explicitly”), aff'd, 534 U.S. 84, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001).
In addition, Congress knows how to ensure that a prior-enacted statute restricts the meaning of a later-enacted statute. RFRA is just such a statute, restricting later-enacted federal statutes unless those statutes specifically exempt themselves. See 42 U.S.C. § 2000bb-3(b). Congress put nothing similar in Title VII, the ADA, or the NLRA.

*1131
c. Case Law

The government nonetheless points to Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), for the idea that the for-profit/non-profit distinction was well-established in Congress’s mind before it enacted RFRA. We disagree with the government’s interpretation of Amos.
Amos involved employees of non-profit and arguably non-religious businesses run by the Mormon Church. These businesses had fired certain Mormon employees who did not follow church behavioral standards, and the employees sued under Title VII. The Church moved to dismiss based on Title VU’s exemption for “religious eorporation[s],” 42 U.S.C. § 2000e-l(a) — the same exemption on which the government bases its argument that Congress intended to limit RFRA to non-profit entities.
The plaintiffs countered “that if construed to allow religious employers to discriminate on religious grounds in hiring for nonreligious jobs, [the exemption] violates the Establishment Clause.” Amos, 483 U.S. at 331, 107 S.Ct. 2862 (emphasis added). The district court agreed, reasoning in part that Title VII’s exemption unlawfully advanced religion because it could “permit churches with financial resources impermissibly to extend their influence and propagate their faith by entering the commercial, profit-making world.” Id. at 337,107 S.Ct. 2862.
The Supreme Court reversed. It concluded this particular part of the district court’s reasoning was incorrect because it assumed the existence of for-profit activities yet none of the Mormon businesses at issue operated on a for-profit basis. The Court never reached the question of how for-profit activity might have changed its analysis. Id.
Two Amos concurrences raised concerns about religion-sponsored for-profit activity more explicitly. But both concurrences were careful not to categorically exclude such activity from Title VU’s exemption. See id. at 345 n. 6, 107 S.Ct. 2862 (Brennan, J., concurring) (emphasizing that the non-profit distinction was important but also noting “[i]t is ... conceivable that some for-profit activities could have a religious character”); id. at 349, 107 S.Ct. 2862 (O’Connor, J., concurring) (noting that the question “remains open” whether “activities conducted by religious organizations solely as profit-making enterprises” would qualify as religious).
From these references to non-profit status in Amos, the government concludes that the for-profit/non-profit distinction matters a great deal. But we do not see what the government sees in Amos. Amos was about whether Title VU’s religious exemption violates the Establishment Clause. The Amos majority rendered no opinion on how for-profit activity might affect that question. At best, then, Amos leaves open the question of whether for-profit status matters for Title VU’s religious employer exemption. We do not see how it provides the “context” that would render the Dictionary Act’s definition of “person” inappropriate in RFRA.
Nor do the other post-RFRA circuit cases on which the government relies provide more guidance. The government cites Spencer v. World Vision, Inc., 633 F.3d 723 (9th Cir.2010) (per curiam), and University of Great Falls v. NLRB, 278 F.3d 1335 (D.C.Cir.2002). The question in Spencer was whether a faith-based humanitarian organization could receive the same Title VII exemption at issue in Amos. In a fractured opinion, the court concluded the organization was eligible, in part because it did not engage in for-profit business activity. But Spencer established no categorical rule regarding for-profit entities. Judge O’ Scannlain, in explaining why he agreed to make non-profit status a relevant con *1132 sideration, nonetheless noted that Amos left open the potential effect of for-profit status. Id. at 734 & n. 13 (O’Scannlain, J., concurring).
The D.C. Circuit’s Great Falls decision comes to essentially the same place, concluding that for-profit status can be one relevant factor among others when it comes to certain religious exemptions. In that case, the University of Great Falls contended that it was exempt from NLRB jurisdiction under both Catholic Bishop and RFRA. The D.C. Circuit adopted a three-factor test for the NLRB to use “to determine whether it has jurisdiction [over a school claiming the Catholic Bishop exemption] without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands.” Great Falls, 278 F.3d at 1345. Among the three factors was whether the institution “is organized as a nonprofit.” Id. at 1343 (internal quotation marks omitted).
But Great Falls did not say that only non-profits can qualify for the Catholic Bishop exemption. See id. (“non-profit institutions have a more compelling claim to a Catholic Bishop exemption than for-profit businesses”). Moreover, the opinion made clear that its analysis did not settle anything as to RFRA: “a ruling that an entity is not exempt from [NLRB] jurisdiction under Catholic Bishop may not foreclose a [RFRA] claim that requiring that entity to engage in collective bargaining would ‘substantially burden’ its ‘exercise of religion.’ ” Id. at 1347.
To the extent the government believes Spencer and Great Falls form part of what “Congress carried forward” when enacting RFRA, Aple. Br. at 16, Spencer and Great Falls, of course, post-date RFRA. Congress therefore could not have carried them forward into RFRA. And to the extent the government sees Spencer and Great Falls as following principles laid down in Amos — which pre-dates RFRA— we disagree. Amos decides nothing about for-profit entities’ religious rights. In short, none of these cases say anything about what Congress intended in RFRA.[8]
In conclusion, the government has given us no persuasive reason to think that Congress meant “person” in RFRA to mean anything other than its default meaning in the Dictionary Act — which includes corporations regardless of their profit-making status.[9]

*1133
2. Free Exercise

The government further argues that the “[t]he distinction between non-profit, religious organizations and for-profit, secular companies is rooted in the text of the First Amendment,” Aple. Br. at 12 (internal quotation marks omitted). It claims this understanding of the First Amendment informed what Congress intended by “person” in RFRA. Undoubtedly, Congress’s understanding of the First Amendment informed its drafting of RFRA, but we see no basis for concluding that such an understanding included a for-profit/nonprofit distinction.

a. RFRA’s Purpose

RFRA was Congress’s attempt to legislatively overrule Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Smith had abrogated much of the Supreme Court’s earlier jurisprudence regarding whether a neutral law of general application nonetheless impermissibly burdened a person’s Free Exercise rights. The pre-Smith test exempted such a person from the law’s constraints unless the government could show a compelling need to apply the law to the person. Id. at 882-84, 110 S.Ct. 1595. Smith eliminated that test on the theory that the Constitution permits burdening Free Exercise if that burden results from a neutral law of general application. Id. at 878-80, 110 S.Ct. 1595.
Congress responded to Smith by enacting RFRA, which re-imposed a stricter standard on both the states and the federal government. The Supreme Court held that Congress could not constitutionally apply RFRA to the states, City of Boerne v. Flores, 521 U.S. 507, 532, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), but RFRA still constrains the federal government, Kikumura, 242 F.3d at 959.
Congress, through RFRA, intended to bring Free Exercise jurisprudence back to the test established before Smith. There is no indication Congress meant to alter any other aspect of pre-Smith jurisprudence — including jurisprudence regarding who can bring Free Exercise claims. We therefore turn to that jurisprudence.

b. Corporate and For-Profit Free Exercise Rights

It is beyond question that associations — not just individuals — have Free Exercise rights: “An individual’s freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.” Roberts v. U.S. Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (emphasis added). Therefore, courts have “recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.” Id. at 618, 104 S.Ct. 3244 (emphasis added); see also Citizens United v. FEC, 558 U.S. 310, 342-43, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (“First Amendment protection extends to corporations ... [, and the Court] has thus rejected the argument that ... corporations or other associations should be treated differently under the First Amendment simply because such associations are not natural persons.” (internal quotation marks omitted)).
Accordingly, the Free Exercise Clause is not a “ ‘purely personal’ guarantee[ ] ... unavailable to corporations and other organizations because the ‘historic function’ of the particular [constitutional] *1134 guarantee has been limited to the protection of individuals.” First Nat’l Bank of Boston v. Bellotti 435 U.S. 765, 778 n. 14, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). As should be obvious, the Free Exercise Clause at least extends to associations like churches — including those that incorporate. See, e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 525, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (holding that a “not-for-profit corporation organized under Florida law” prevailed on its Free Exercise claim); see also Terrett v. Taylor, 13 U.S. (9 Crunch) 43, 49, 3 L.Ed. 650 (1815) (Story, J.) (“[The] legislature may ... enable all sects to accomplish the great objects of religion by giving them corporate rights for the management of their property, and the regulation of their temporal as well as spiritual concerns.”).
In addition, the Supreme Court has settled that individuals have Free Exercise rights with respect to their for-profit businesses. See, e.g., United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (considering a Free Exercise claim of an Amish employer); Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (plurality opinion) (considering a Free Exercise claim by Jewish merchants operating for-profit).
In short, individuals may incorporate for religious purposes and keep their Free Exercise rights, and unincorporated individuals may pursue profit while keeping their Free Exercise rights. With these propositions, the government does not seem to disagree. The problem for the government, it appears, is when individuals incorporate and fail to satisfy Internal Revenue Code § 501(c)(3). At that point, Free Exercise rights somehow disappear.
This position is not “rooted in the text of the First Amendment,” Aple. Br. at 12, and therefore could not have informed Congress’s intent when enacting RFRA. As an initial matter, the debates in Congress surrounding the adoption of the First Amendment demonstrate an intent to protect a range of conduct broader than the mere right to believe whatever one chooses. Indeed, at the time of the amendment’s inception in Congress, a competing formulation for the “free exercise of religion” was “rights of conscience.” See Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L.Rev. 1409, 1488 (1990) [hereinafter McConnell, The Origins]; see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, — U.S. —, 132 S.Ct. 694, 702, 181 L.Ed.2d 650 (2012) (citing McConnell, The Origins, supra). As compared to exercise, which “strongly connoted action” in the language of the day, “conscience” suggested mere thoughts, opinions, or internal convictions. McConnell, The Origins, supra at 1489. Congress chose exercise, indicating that, as the Supreme Court has frequently held, the protections of the Religion Clauses extend beyond the walls of a church, synagogue, or mosque to religiously motivated conduct, as well as religious belief. Id. at 1488-89.
The distinction gains force here because religious conduct includes religious expression, which can be communicated by individuals and for-profit corporations alike. See Smith, 494 U.S. at 877-78, 110 S.Ct. 1595 (1990); see also Lee Strang, The Meaning of “Religion” in the First Amendment, 40 Duq. L.Rev. 181, 234 (2002) (stating that the shift from “conscience” to “religion” “connote[d] a ‘community of believers’ and allow[ed] for protection of the ‘corporate or institutional aspect of religious belief ” (footnote omitted)); McConnell, The Origins, supra at 1490 (stating that an “important difference between the terms ‘conscience’ and ‘religion’ is that ‘conscience’ emphasizes indi *1135 vidual judgment, while ‘religion’ also encompasses the corporate or institutional aspects of religious belief’ (footnote omitted)). For example, the Supreme Court has stated that the exercise of religion includes “proselytizing.” Smith, 494 U.S. at 877, 110 S.Ct. 1595. And, as discussed above, Hobby Lobby and Mardel — two for-profit corporations — -proselytize by purchasing hundreds of newspaper ads to “know Jesus as Lord and Savior.” JA 24a. Because Hobby Lobby and Mardel express themselves for religious purposes, the First Amendment logic of Citizens United, 558 U.S. at 342-55, 130 S.Ct. 876, where the Supreme Court has recognized a First Amendment right of for-profit corporations to express themselves for political purposes, applies as well. We see no reason the Supreme Court would recognize constitutional protection for a corporation’s political expression but not its religious expression.
We also believe that a constitutional distinction would conflict with the Supreme Court’s Free Exercise precedent. First, we cannot see why an individual operating for-profit retains Free Exercise protections but an individual who incorporates— even as the sole shareholder — does not, even though he engages in the exact same activities as before. This cannot be about the protections of the corporate form, such as limited liability and tax rates. Religious associations can incorporate, gain those protections, and nonetheless retain their Free Exercise rights.
Moreover, when the Supreme Court squarely addressed for-profit individuals’ Free Exercise rights in Lee and Braunfeld, its analysis did not turn on the individuals’ unincorporated status. Nor did the Court suggest that the Free Exercise right would have disappeared, using a more modern formulation, in a general or limited partnership, sole professional corporation, LLC, S-corp, or closely held family business like we have here.[10]
In addition, sincerely religious persons could find a connection between the exercise of religion and the pursuit of profit. Would an incorporated kosher butcher really have no claim to challenge a regulation mandating non-kosher butchering practices? The kosher butcher, of course, might directly serve a religious community — as Mardel, a Christian bookstore, does here. But we see no reason why one must orient one’s business toward a religious community to preserve Free Exercise protections. A religious individual may enter the for-profit realm intending to demonstrate to the marketplace that a corporation can succeed financially while adhering to religious values. As a court, we do not see how we can distinguish this form of evangelism from any other.
We are also troubled — as we believe Congress would be — by the notion that Free Exercise rights turn on Congress’s definition of “non-profit.” What if Congress eliminates the for-profit/non-profit distinction in tax law? Do for-profit corporations then gain Free Exercise rights? Or do non-profits lose Free Exercise rights? Or what if Congress, believing that large organizations are less likely to have a true non-profit motive, declares that non-profit entities may not have more than 1,000 employees? Would a church with more than 1,000 employees lose its Free Exercise rights? Or consider a church that, for whatever reason, loses its 501(c)(3) status. Does it thereby lose Free Exercise rights?
*1136 To hypothetical like these, the government cites to the Supreme Court’s recent Hosanna-Tabor decision, where the Court recognized a ministerial exception that foreclosed review of the propriety of the decision of a “church” (understood in a broad sense that includes all religions) to hire or retain a “minister” (with the same broad meaning). In recognizing this ministerial exception, the Court found the exception precluded a claim brought under the Americans with Disabilities Act by a former employee of a school run by a denomination of the Lutheran church. The Court reiterated the uncontroversial proposition that “the text of the First Amendment ... gives special solicitude to the rights of religious organizations.” Hosanna-Tabor, 132 S.Ct. at 706. From this language, the government draws a narrow application of the Free Exercise Clause.
We do not share this interpretation. The main point of the Court was that the Religion Clauses add to the mix when considering freedom of association. See also id. at 712-13 (Alito, J., concurring) (“As the Court notes, the First Amendment ‘gives special solicitude to the rights of religious organizations,’ but our expressive-association cases are nevertheless useful in pointing out what ... essential rights are [held by religious organizations].” (emphasis added)). But it does not follow that because religious organizations obtain protections through the Religion Clauses, all entities not included in the definition of religious organization are accorded no rights.
And, by relying on this language from Hosanna-Tabor, the government appears to concede that the for-profit/non-profit distinction is actually immaterial even under its own theory of the case. Under the government’s position, only “religious organizations” receive Free Exercise rights. Any other organization, non-profit or for-profit, could not receive such protection. But Hosannar-Tabor was not deciding for-profit corporations’ Free Exercise rights, and it does not follow that the Congress which enacted RFRA would have understood the First Amendment to contain such a bright-line rule.
The district court, nonetheless, saw in-congruence between Free Exercise rights and the corporate form: “General business corporations ... do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.” Hobby Lobby, 870 F.Supp.2d at 1291. But this is equally true of churches or other entities that exercise religion. The Church of Lukumi Babalu Aye, Inc., for example, did not itself pray, worship, or observe sacraments — nor did the sect in 0 Centro. But both certainly have Free Exercise rights. See O Centro, 546 U.S. at 423, 126 S.Ct. 1211; Lukumi, 508 U.S. at 525, 113 S.Ct. 2217.[11]
The government nonetheless raises the specter of future cases in which, for example, a large publicly traded corporation tries to assert religious rights under RFRA. That would certainly seem to raise difficult questions of how to determine the *1137 corporation’s sincerity of belief. But that is not an issue here. Hobby Lobby and Mardel are not publicly traded corporations; they are closely held family businesses with an explicit Christian mission as defined in their governing principles. The Greens, moreover, have associated through Hobby Lobby and Mardel with the intent to provide goods and services while adhering to Christian standards as they see them, and they have made business decisions according to those standards. And the Greens are unanimous in their belief that the contraceptive-coverage requirement violates the religious values they attempt to follow in operating Hobby Lobby and Mardel. It is hard to compare them to a large, publicly traded corporation, and the difference seems obvious. Thus, we do not share any concerns that our holding would prevent courts from distinguishing businesses that are not eligible for RFRA’s protections.
We need not decide today whether any of these factors is necessary, but we conclude that their collective presence here is sufficient for Hobby Lobby and Mardel to qualify as “persons” under RFRA.[12]

B. Substantial Burden

The next question is whether the contraceptive-coverage requirement constitutes a substantial burden on Hobby Lobby and Mardel’s exercise of religion.
The government urges that there can be no substantial burden here because “[a]n employee’s decision to use her health coverage to pay for a particular item or service cannot properly be attributed to her employer.” Aple. Br. at 13. There are variations on this same theme in many of the amicus briefs supporting the government’s position, all of which stand for essentially the same proposition: one does not have a RFRA claim if the act of alleged government coercion somehow depends on the independent actions of third parties.
This position is fundamentally flawed because it advances an understanding of “substantial burden” that presumes “substantial” requires an inquiry into the theological merit of the belief in question rather than the intensity of the coercion applied by the government to act contrary to those beliefs. In isolation, the term “substantial burden” could encompass either definition, but for the reasons explained below, the latter interpretation prevails. Our only task is to determine whether the claimant’s belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief.
No one disputes in this case the sincerity of Hobby Lobby and Mardel’s religious beliefs. And because the contraceptive-coverage requirement places substantial *1138 pressure on Hobby Lobby and Mardel to violate their sincere religious beliefs, their exercise of religion is substantially burdened within the meaning of RFRA.

1. The Substantial Burden Test

Our most developed case discussing the substantial burden test is Abdulhaseeb v. Calbone, 600 F.3d 1301 (10th Cir.2010). In Abdulhaseeb, we were required to resolve a RFRA claim brought by Madyun Abdulhaseeb, a Muslim prisoner who raised a religious objection to the prison’s failure to provide him a halal diet. Abdulhaseeb alleged that the prison cafeteria’s failure to serve halal food violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), a statute that adopts RFRA’s “substantial burden” standard.[13]
In analyzing Abdulhaseeb’s claim, we held that a government act imposes a “substantial burden” on religious exercise if it: (1) “requires participation in an activity prohibited by a sincerely held religious belief,” (2) “prevents participation in conduct motivated by a sincerely held religious belief,” or (3) “places substantial pressure on an adherent ... to engage in conduct contrary to a sincerely held religious belief.” Id. at 1315. Our analysis in Abdulhaseeb only concerned the third prong of this test, related to “substantial pressure.” As we will explain below, the same is true here.
The substantial pressure prong rests firmly on Supreme Court precedent, in particular: Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982).
The plaintiff in Thomas was a Jehovah’s Witness who had worked for a company that owned both a foundry and factory. The foundry processed sheet steel for a variety of industrial purposes. The factory manufactured turrets for military tanks. The plaintiff started working at the foundry but was transferred to the factory. Although he had no objection to working in the foundry, he raised a religious objection to his factory job, claiming that “he could not work on weapons without violating the principles of his religion.” Thomas, 450 U.S. at 710, 101 S.Ct. 1425. He quit his job and was eventually denied unemployment benefits. He then challenged this decision as improperly burdening his right to exercise his religion, a claim which ultimately reached the Supreme Court.
In considering the Free Exercise claim, the Court noted that the plaintiff could not clearly articulate the basis for the difference between processing steel that might be used in tanks and manufacturing the turrets themselves. Id. at 715, 101 S.Ct. 1425. But that was not relevant to resolving the plaintiffs claim. Rather, the Court observed, “the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.” Id. Further, “[particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner ... correctly perceived the commands of [his] faith. Courts are not arbiters of scriptural interpretation.” Id. at 716, 101 S.Ct. 1425 (internal quotation marks omitted).
As to the distinction between factory and foundry work, the Court reasoned that “[the plaintiffs] statements reveal no more than that he found work in the ... foundry sufficiently insulated from producing *1139 weapons of war. We see, therefore, that [the plaintiff] drew a line, and it is not for us to say that the line he drew was an unreasonable one.” Id. at 715, 101 S.Ct. 1425. In other words, the distinction that the plaintiff drew was not as important as the fact that he made it based upon his religious beliefs. Once the plaintiff drew this line, it did not matter whether the line was “acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.” Id. at 714, 101 S.Ct. 1425.
Accepting the plaintiffs religious beliefs as sincere, the Court then examined “the coercive impact” upon him of being “put to a choice between fidelity to religious belief or cessation of work.” Id. at 717,101 S.Ct. 1425. On that score, the Court found a substantial burden:
Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.
Id. at 717-18, 101 S.Ct. 1425 (emphasis added).
United States v. Lee similarly demonstrates that the burden analysis does not turn on whether the government mandate operates directly or indirectly, but on the coercion the claimant feels to violate his beliefs. The question in Lee was “whether the payment of social security taxes and the receipt of benefits interferes with the free exercise rights of the Amish.” 455 U.S. at 256-57, 102 S.Ct. 1051. The Court first identified the religious belief at issue, namely, that “it [is] sinful [for the Amish] not to provide for their own elderly and needy,” and it is concomitantly sinful to pay into the social security system and thereby enable other Amish to shirk their duties toward the elderly and needy. Id. at 255 & n. 3, 102 S.Ct. 1051. Thus, the belief at issue in Lee turned in part on a concern of facilitating others’ wrongdoing.
In responding to Lee’s claims, the government did not question the sincerity of the plaintiffs belief, but it did raise a direct/indirect argument, ie., “that payment of social security taxes will not threaten the integrity of the Amish religious belief or observance.” Id. at 257, 102 S.Ct. 1051. As in Thomas, the Court in Lee would not indulge the government on this point, reasoning simply that “[i]t is not within the judicial function and judicial competence ... to determine whether” a plaintiff “has the proper interpretation of [his] faith.” Id. (internal quotation marks omitted).
The Court in Lee found “a conflict between the Amish faith and the obligations imposed by the social security system.” Id. But, it said, “[n]ot all burdens on religion are unconstitutional.” Id. The Court concluded, under the circumstances, that the burden was justified by “the Government’s interest in assuring mandatory and continuous participation in and contribution to the social security system” — an interest which the Court described as “very high.” Id. at 258-59, 102 S.Ct. 1051. The Court determined that this interest justified the acknowledged burden on religious belief. Id.[14] But again, the analysis did not turn on whether the Amish faced direct or *1140 indirect coercion or whether the supposed violations of their faith turned on actions of independent third parties. The Court recognized the belief for what it was, accepted that the government was imposing a burden, and then analyzed the strength of the government’s interest.
Given the foregoing, our first step in Abdulhaseeb was to identify the belief in question — the immorality of a non-halal diet — and to determine if the belief was sincerely held. Finding it was, we stated that “the issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens Mr. Abdulhaseeb’s own exercise of his sincerely held religious beliefs.” 600 F.3d at 1314 (emphasis in original). We concluded that the prison cafeteria’s “failure to provide a halal diet either prevents Mr. Abdulhaseeb’s religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson’s choice — either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat.” Id. at 1317. Thus, the plaintiff faced a substantial burden.

2. Applying the Substantial Burden Test

The claims of Hobby Lobby and Mardel are similar to those raised in Thomas, Lee, and Abdulhaseeb, and the framework provided in those cases guides our analysis.
First, we must identify the religious belief in this case. The corporate plaintiffs believe life begins at conception. Thus, they have what they describe as “a sincere religious objection to providing coverage for Plan B and Ella since they believe those drugs could prevent a human embryo ... from implanting in the wall of the uterus, causing the death of the embryo.” JA 35a. And they allege a “sincere religious objection to providing coverage for certain contraceptive [IUDs] since they believe those devices could prevent a human embryo from implanting in the wall of the uterus, causing the death of the embryo.” Id. Further, Hobby Lobby and Mardel object to “participating in, providing access to, paying for, training others to engage in, or otherwise supporting” the devices and drugs that yield these effects. Aplt. Br. at 27 (citing JA 14a).
Second, we must determine whether this belief is sincere. The government does not dispute the corporations’ sincerity, and we see no reason to question it either.[15]
Third, we turn to the question of whether the government places substantial pressure on the religious believer. Here, it is difficult to characterize the pressure as anything but substantial. To the extent Hobby Lobby and Mardel provide a health plan, they would be fined $100 per employee, per day the plan does not meet the contraceptive — coverage requirement. 26 U.S.C. § 4980D(b)(l). With over 13,000 employees, that comes to more than $1.3 million per day, or close to $475 million per year. And if Hobby Lobby and Mardel simply stop offering a health plan — dropping health insurance for more than 13,000 employees — then the companies must pay about $26 million per year, see id. § 4980H(c)(l) (fining employer $2,000 per employee per year), and put themselves “at a competitive disadvantage in [their] *1141 efforts to recruit and retain employees,” JA 40a.
With this dilemma created by the statute, we believe that Hobby Lobby and Mardel have made a threshold showing regarding a substantial burden. Ordinarily, the question of substantial burden would involve subsidiary factual issues. See Kikumura, 242 F.3d at 961; id. at 966 (Holloway, J., concurring in part and dissenting in part); id. at 966-67 (Ebel, J., concurring). But in the district court, the government did not question the significance of the financial burden. And, the government has not done so in this appeal. Thus, the district court record leaves only one possible scenario: Hobby Lobby and Mardel incurred a substantial burden on their ability to exercise their religion because the law requires Hobby Lobby and Mardel to:
• compromise their religious beliefs,
• pay close to $475 million more in taxes every year, or
• pay roughly $26 million more in annual taxes and drop health-insurance benefits for all employees.
This is precisely the sort of Hobson’s choice described in Abdulhaseeb, and Hobby Lobby and Mardel have established a substantial burden as a matter of law.

3. The Government’s Arguments

The government resists this conclusion, contending the regulations place no burden on Hobby Lobby or Mardel. It insists the insurance coverage at issue is just another form of non-wage compensation — supposedly the equivalent of money — and therefore should not present problems under RFRA.
Such reasoning cannot be squared with the Supreme Court’s holding in Thomas. The Supreme Court emphasized that when the plaintiff drew a moral line between foundry and factory work, it was not the Court’s prerogative to determine whether the line he drew “was an unreasonable one.” Thomas, 450 U.S. at 715, 101 S.Ct. 1425.
Just so here: Hobby Lobby and Mardel have drawn a line at providing coverage for drugs or devices they consider to induce abortions, and it is not for us to question whether the line is reasonable. This is especially so given that Hobby Lobby and Mardel stand in essentially the same position as the Amish carpenter in Lee, who objected to being forced to pay into a system that enables someone else to behave in a manner he considered immoral. That is precisely the objection of Hobby Lobby and Mardel. It is not the employees’ health care decisions that burden the corporations’ religious beliefs, but the government’s demand that Hobby Lobby and Mardel enable access to contraceptives that Hobby Lobby and Mardel deem morally problematic. As the Supreme Court accepted the religious belief in Lee, so we must accept Hobby Lobby and Mardel’s beliefs.[16]
*1142 For similar reasons, the government’s reliance on Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), and Board of Regents v. Southworth, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), is misplaced. First, in Zelman, the Supreme Court addressed an Establishment Clause challenge to a school voucher program where an overwhelming majority of the students were using vouchers to enroll at religious schools. 536 U.S. at 647,122 S.Ct. 2460. The Court concluded that such a program did not violate the Establishment Clause in part because “the perceived endorsement of a religious message! ] is reasonably attributable to the individual recipient, not to the government,” id. at 652, 122 S.Ct. 2460, and in part because “no reasonable observer would think a neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals, carries with it the imprimatur of government endorsement,” id. at 655, 122 S.Ct. 2460 (emphasis added).
Southworth involved a similar claim brought by university students who challenged a mandatory fee that would be used in part to fund other student groups that produced speech the plaintiffs found objectionable. 529 U.S. at 230, 120 S.Ct. 1346. The Court concluded that because funds for student activities were distributed to student groups on a viewpoint-neutral basis, this system prevented “any mistaken impression that the student [groups] speak for the University” or for the plaintiffs. Id. at 233, 120 S.Ct. 1346 (internal quotation marks omitted).
The government attempts to analogize these Free Speech and Establishment Clause cases to the question here. The government suggests that because it was not possible to attribute the offensive speech to the students in Southworth and the support for religious schools to the state in Zelman, it is also impossible to attribute an employee’s independent choice to the employer.
We reject this position because it assumes that moral culpability for the religious believer can extend no further than the government’s legal culpability in the Establishment or Free Speech contexts. Again, Thomas teaches that the plaintiff is not required to articulate a legal principle for the line he draws, let alone point to an analog from potentially related fields of constitutional law. And the question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity.[17]
Hobby Lobby and Mardel have therefore established a substantial burden to their sincerely held religious beliefs. We now turn to the final question: whether the government has presented a compel *1143 ling interest implemented through the least restrictive means available.[18]

C. Compelling Interest and Least Restrictive Means

As noted above, even at the preliminary injunction stage, RFRA requires the government to demonstrate that mandating a plaintiffs compliance with the contraceptive-coverage requirement is “the least restrictive means of advancing a compelling interest.” 0 Centro, 546 U.S. at 423, 126 S.Ct. 1211 (citing 42 U.S.C. § 2000bb-l(b)). As the Supreme Court emphasized, this standard requires that we “look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.” Id. at 431,126 S.Ct. 1211.
The interest must also be narrowly tailored. “RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law ‘to the person’ — the particular claimant whose sincere exercise of religion is being substantially burdened.” Id. at 430, 126 S.Ct. 1211 (quoting 42 U.S.C. § 2000bb-l(b)) (emphasis added). Thus, the government must show with “particularity how [even] admittedly strong interest[s]” “would be adversely affected by granting [the] exemption” specifically requested by Hobby Lobby and Mardel. Wisconsin v. Yoder, 406 U.S. 205, 236, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

1. Compelling Interest

The government asserts two interests here: “the interests in [1] public health and [2] gender equality.” Aple. Br. at 34. We recognize the importance of these interests. But they nonetheless in this context do not satisfy the Supreme Court’s compelling interest standards.
First, both interests as articulated by the government are insufficient under O Centro because they are “broadly formulated interests justifying the general applicability of government mandates.” 546 U.S. at 431, 126 S.Ct. 1211. And the government offers almost no justification for not “granting specific exemptions to particular religious claimants.” Id.
Second, the interest here cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people. As noted above, this exempted population includes those working for private employers with grandfathered plans, for employers with fewer than fifty employees, and, under a proposed rule, for colleges and universities run by religious institutions. As the Supreme Court has said, “a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.” Lukumi, 508 U.S. at 547, 113 S.Ct. 2217; see also O Centro, 546 U.S. at 433, 126 S.Ct. 1211 (citing Lukumi as instructive in determining whether exemptions undermine a compelling government interest for purposes of RFRA). The exemptions at issue here would yield precisely this result: they would leave un *1144 protected all women who work for exempted business entities.
On this question, 0 Centro is particularly instructive. In that case, a religious group sought an exemption for the sacramental use of hoasca, a hallucinogen classified as a Schedule 1(c) controlled substance under the Controlled Substances Act. The question in 0 Centro was limited to whether the government could show a compelling governmental interest under RFRA to justify what was indisputably a substantial burden on the plaintiffs’ exercise of religion. The government in part relied on its interest in promoting public health and safety and upon Congress’s determination that hoasca “ ‘has a high potential for abuse,’ ‘has no currently accepted medical use,’ and has ‘a lack of accepted safety for use ... under medical supervision.’ ” 0 Centro, 546 U.S. at 433, 126 S.Ct. 1211 (quoting 21 U.S.C. § 812(b)(1)).
The Supreme Court refused to credit this argument, however, in part because the CSA and related regulations contained an exemption for the religious use of another substance categorized as a Schedule I hallucinogen, peyote. As the Court reasoned, “Everything the Government says about the [dangerous chemicals] in hoasca ... applies in equal measure to the [dangerous chemicals] in peyote.” Id. Because both the Executive Branch and Congress had decreed a religious exemption for Native American use of peyote, the Court concluded that “it [was] difficult to see how” those same concerns could “preclude any consideration of a similar exception for” the religious use of hoasca. Id. If the peyote exemption in 0 Centro, which applied to “hundreds of thousands of Native Americans,” id., was enough to undermine the government’s compelling interest argument in that case, we conclude the exemption for the millions of individuals here must dictate a similar result.

2. Least Restrictive Means

Even if the government had stated a compelling interest in public health or gender equality, it has not explained how those larger interests would be undermined by granting Hobby Lobby and Mardel their requested exemption. Hobby Lobby and Mardel ask only to be excused from covering four contraceptive methods out of twenty, not to be excused from covering contraception altogether. The government does not articulate why accommodating such a limited request fundamentally frustrates its goals.[19]

3. Hobby Lobby and Mardel Employees

Finally, we note a concern raised both at oral argument and in the government’s briefing that Hobby Lobby and Mardel are, in effect, imposing their religious views on their employees or otherwise burdening their employees’ religious beliefs. But Hobby Lobby and Mardel do not prevent employees from using their own money to purchase the four contraceptives at issue here.
Of course, employees of Hobby Lobby and Mardel seeking any of these four contraceptive methods would face an economic burden not shared by employees of companies that cover all twenty methods. But the government must show why the employees’ burden creates a compelling interest that can only be met by requiring the corporations to conform to a mandate.
Accommodations for religion frequently operate by lifting a burden from the ac *1145 commodated party and placing it elsewhere. The government itself has even taken this step with the contraceptive-coverage requirement by accommodating certain religious employers, at the expense of their employees. That is part of accommodating religion — and is RFRA’s basic purpose.
In sum, for all of these reasons, Hobby Lobby and Mardel have established they are likely to succeed on their RFRA claim.
VI. Remaining Preliminary Injunction Factors[20]
Having concluded that Hobby Lobby and Mardel are likely to succeed on the merits, we turn to the remaining preliminary injunction factors: whether Hobby Lobby and Mardel face irreparable harm; whether the balance of equities tips in Hobby Lobby and Mardel’s favor; and whether an injunction is in the public interest. Att’y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir.2009). The district court did not analyze these factors (having disposed of the question on the likelihood-of-success prong) but Hobby Lobby and Mardel nonetheless ask that we reach them.

A. Propriety of Reaching the Remaining Factors

“If the district court fails to analyze the factors necessary to justify a preliminary injunction, this court may do so [in the first instance] if the record is sufficiently developed.” Westar Energy, 552 F.3d at 1224. The record we have is the record the parties chose to create below— it is the record they deemed sufficient for the district court to decide the preliminary injunction question. For each element, we believe this record suffices for us to resolve each of the remaining preliminary injunction factors.[21]
In addition, “in First Amendment cases, the likelihood of success on the merits will often be the determinative factor.” ACLU of Illinois v. Alvarez, 679 F.3d 583, 589 (7th Cir.2012), cert. denied, — U.S. —, 133 S.Ct. 651, 184 L.Ed.2d 459 (2012). That is because:
• “the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury, Heideman v. S. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir.2003) (internal quotation marks omitted);
• “when [a] law ... is likely unconstitutional, the[] interests [of those the government represents, such as voters] do not outweigh [a plaintiffs interest] in having [its] constitutional rights protected,” Awad v. Ziriax, 670 F.3d 1111, 1131-32 (10th Cir.2012); and
• “it is always in the public interest to prevent the violation of a party’s constitutional rights,” id. at 1132.
*1146 This is likewise true here since RFRA is no ordinary statute: “Federal statutory law adopted after November 16, 1993 is subject to [RFRA] unless such law explicitly excludes such application by reference to this chapter.” 42 U.S.C. § 2000bb-3(b). Congress thus obligated itself to explicitly exempt later-enacted statutes from RFRA, which is conclusive evidence that RFRA trumps later federal statutes when RFRA has been violated. That is why our case law analogizes RFRA to a constitutional right. Kikumura, 242 F.3d at 963 (stating, in analyzing a RFRA claim, that “[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary” (emphasis added; internal quotation marks omitted)); see also Michael Paulsen, A RFRA Runs Through It: Religious Freedom and the U.S.Code, 56 Mont. L.Rev. 249, 253 (1995) (characterizing RFRA as a “super-statute” given its binding nature on subsequent federal action). Congress did not exempt the ACA from RFRA, nor did it create any sort of wide-ranging exemption for HHS and other agencies charged with implementing the ACA through the regulations challenged here.
Finally, the government nowhere contested the factual adequacy or accuracy of Hobby Lobby and Mardel’s allegations, and given that those allegations were established through a verified complaint, they are deemed admitted for preliminary injunction purposes. IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 542 (7th Cir.1998) (noting that “[verified complaints[ are] the equivalent of affidavits”); 11A Charles Alan Wright et al., Fed. Prac. & Proc. § 2949 (2d ed., Apr. 2013 update) (“[T]he written evidence [in a preliminary injunction proceeding] is presumed true if it is not contradicted.”).
In short, the record before us is enough to resolve the remaining preliminary injunction factors. Given Hobby Lobby and Mardel’s July 1 deadline, prudence strongly counsels in favor of reaching those factors. Thus, we would reach them and find that they favor Hobby Lobby and Mardel. Indeed, as we discuss next, even if likelihood of success was not enough to settle the question, we would find in favor of Hobby Lobby and Mardel.

B. Analysis of Remaining Factors 1. Irreparable Harm

Hobby Lobby and Mardel have established a likely violation of RFRA. We have explicitly held — by analogy to First Amendment cases — that establishing a likely RFRA violation satisfies the irreparable harm factor. See Kikumura, 242 F.3d at 963 (“a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA”); see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 342 F.3d 1170, 1187 (10th Cir.2003) (same). Hobby Lobby and Mardel have therefore demonstrated irreparable harm.

2. Balance of Equities

Nor is there any question about the balance of equities. A preliminary injunction would forestall the government’s ability to extend all twenty approved contraceptive methods to Hobby Lobby and Mardel’s 13,000 employees. But Hobby Lobby and Mardel will continue to provide sixteen of the twenty contraceptive methods, so the government’s interest is largely realized while coexisting with Hobby Lobby and Mardel’s religious objections. And in any event, the government has already exempted health plans covering millions of others. These plans need not provide any of the twenty contraceptive methods.
By contrast, Hobby Lobby and Mardel remain subject to the Hobson’s choice between catastrophic fines or violating its *1147 religious beliefs. Accordingly, the balance of equities tips in Hobby Lobby and Mardel’s favor.

3. Public Interest

Finally, as stated above, “it is always in the public interest to prevent the violation of a party’s constitutional rights.” Awad, 670 F.3d at 1132. Again, as already noted, although RFRA violations are not constitutional violations, Congress has given RFRA similar importance by subjecting all subsequent congressional enactments to a strict scrutiny standard of review unless those enactments explicitly exclude themselves from RFRA. See 42 U.S.C. § 2000bb-3(b). And accommodating the two companies in this case does not undermine the application of the contraceptive-coverage requirement to the vast number of employers without religious objections. Because Hobby Lobby and Mardel have demonstrated a likely violation of their RFRA rights, an injunction would be in the public interest.
In sum, all preliminary injunction factors tip in favor of Hobby Lobby and Mardel, and we would therefore remand to the district court with instructions to enter a preliminary injunction.
VII. Conclusion
For the reasons set forth above, we reverse the district court’s denial of the plaintiffs’ motion for a preliminary injunction and remand with instructions that the district court address the remaining two preliminary injunction factors and then assess whether to grant or deny the plaintiffs’ motion. The Clerk is directed to issue the mandate forthwith.

. The en banc court joins as follows:
(1) All judges join Part III; (2) Judges Kelly, Hartz, Tymkovich, Gorsuch, and Bacharach join Parts I, II, III, IV, and V; (3) Judges Kelly, Hartz, Tymkovich, and Gorsuch join Part VI in full, and Judge Bacharach joins as to Section VI(B)(1) only; (4) Judge Hartz separately concurs; (5) Judge Gorsuch separately concurs, joined by Judges Kelly and Tymkovich; (6) Judge Bacharach concurs in part; (7) Chief Judge Briscoe concurs and dissents in part, joined by Judge Lucero; and (8) Judge Matheson concurs and dissents in part.

. Because the district court will be reviewing the RFRA claim, the majority declines at this stage to reach the constitutional question of whether Hobby Lobby and Mardel are likely to succeed on their Free Exercise claim. See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (“A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.”).

. There is an ongoing medical debate as to whether some of the contraceptive methods relevant to this case act by preventing implantation or fertilization. Compare, e.g., Physicians for Reproductive Health et al. Amicus Br. at 12-13, with Ass’n of Am. Physicians & Surgeons et al. Amicus Br. at 12 & n.21. This is relevant because Hobby Lobby and Mardel object to forms of contraception that prevent uterine implantation, but they do not object to those that prevent conception. For purposes of this appeal, however, there is no material dispute. Both the government and the medical amici supporting the government concede that at least some of the contraceptive methods to which the plaintiffs object have the potential to prevent uterine implantation. See, e.g., Aple. Br. at 9 n.6 (noting that one of the three ways emergency contraceptive pills function is by "inhibiting implantation” (quoting 62 Fed.Reg. 8610, 8611 (Feb. 25, 1997))); Physicians for Reproductive Health et al. Amicus Br. at 16 (noting that some studies suggest the copper present in IUDs "can also alter molecules present in the endometrial lining,” which causes "alteration of the endometrial lining [that] prevents ... implantation” (emphasis added)). Some of our colleagues suggest this debate extends only to intrauterine devices, not Plan B and Ella. See Briscoe Op. at 1164. Whatever the merits of this argument, we need not wade into scientific waters here, given the above-noted agreement that some of the challenged devices function in a manner that Hobby Lobby and Mardel find morally problematic.

. The plaintiffs also contend that the Greens, as owners of Hobby Lobby and Mardel, have standing in their own right to bring the claims at issue here. But there is no dispute that relief as to Hobby Lobby and Mardel would satisfy the Greens. Because we conclude RFRA protects Hobby Lobby and Mardel, the majority opinion does not reach whether the Greens may likewise bring RFRA claims based on regulations applying to the companies they own. Four judges would nonetheless conclude the Greens have standing and write separately on this question. See Gorsuch Op. (joined by Kelly and Tymkovich, JL), infra; Matheson Op., infra.

. We recognize there is at least tentative disagreement among the courts of appeal on this question. Compare, e.g., Grote v. Sebelius, 708 F.3d 850, 855-56 (7th Cir.2013) (corporation is a “person” for purposes of RFRA), with Conestoga Wood Specialities Corp. v. Sec’y of U.S. Dep't of Health & Human Servs., No. 13-1144, 2013 WL 1277419, at *2 (3d Cir. Feb. 8, 2013) (corporation is not a “person” under RFRA).

. We further note that RFRA defines religious exercise by cross-reference to the Religious Land Use and Institutionalized Persons Act (RLUIPA). See 42 U.S.C. § 2000bb-2(4) (“the term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title”). According to the relevant portion of RLUIPA, " 'religious exercise’ includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” Id. § 2000cc-5(7)(A). RLUIPA further notes that both "person[s]” and “en-tit[ies]” can exercise the religious rights it grants. Id. § 2000cc-5(7)(B). RLUIPA therefore provides further support that RFRA, to which it is linked, encompasses both natural persons and anything that qualifies as an "entity” — which of course would encompass corporations. And this definition likewise does not distinguish between for-profit and non-profit status or between religious and secular entities.

. Catholic Bishop turned on constitutional avoidance, not on statutory text or congressional intent. See id. at 507, 99 S.Ct. 1313 ("in the absence of a clear expression of Congress’fs] intent to bring teachers in church-operated schools within the jurisdiction of the Board, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses”). But for present purposes we will accept the government’s characterization of Catholic Bishop as "context” for RFRA.

. We also note that even the dissent in Grote v. Sebelius, 708 F.3d 850 (7th Cir.2013), would not establish a categorical rule against for-profit religious exercise. Grote involved a car parts business, but the dissent opined that "there do exist some corporate entities which are organized expressly to pursue religious ends, and I think it fair to assume that such entities may have cognizable religious liberties independent of the people who animate them, even if they are profit-seeking.” Id. at 856 (Rovner, J., dissenting).

. The dissents suggest we have improperly placed the burden of persuasion on the government rather than the plaintiffs in our assessment of whether Hobby Lobby and Mardel are persons exercising religion for purposes of RFRA. See Briscoe Op. at 1167-68 & n. 3; Matheson Op. at 1180-84. The question of the allocation of a burden for satisfying the preliminary injunction factors — which we agree rests with the plaintiffs — and the force of the legal arguments advanced by both sides are two different things. The default presumption is that the Dictionary Act applies. Rowland, 506 U.S. at 200, 113 S.Ct. 716. Regardless of who bears the overall burden of persuasion, we do not think it is the plaintiffs’ duty to prove a negative — i.e., to offer up all possible "contexts]” that might “indicate otherwise,” 1 U.S.C. § 1 — and then refute them. In our adversarial system, arguments for otherwise-indicating context naturally come from the party opposing the Dictionary Act’s definition. The government’s arguments in this regard do not convince us.

. To the extent the government believes the for-profit/non-profit distinction derives from the nature of business versus religion, we note that the varieties of corporate form do not mirror such a bright-line rule. See, e.g., Cal. Corp.Code §§ 14600-31 (establishing “benefit corporations” that may pursue profits while balancing social welfare goals).

. This is not a special case of associational standing. Associational standing requires, among other things, that all members of the association "would otherwise have standing to sue in their own right.” S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement, 620 F.3d 1227, 1246 (10th Cir.2010). Although this may often be true for religious organizations, we are aware of no case in which it has been set forth as a requirement. When a religious organization sues in its own right, we do not ask, for example, whether every member of the religious group shares the same belief and therefore faces the same infringement on his or her belief. We accept the entity for what it claims to represent, regardless of unity among the individuals that associate through that entity.

. The dissenters refer to this analysis as a departure from First Amendment law. See Briscoe Op. at 1170; Matheson Op. at 1183— 84. Not so. Where did Hobby Lobby and Mardel lose their Free Exercise rights? Was it when they incorporated? This alone cannot be the relevant trigger because religions may incorporate as well. Was it when they began operating for-profit? Again, this alone cannot be the relevant event because the Supreme Court in Lee and Braunfeld recognized Free Exercise rights in a for-profit context. Is it because Hobby Lobby and Mardel do not have an explicitly religious purpose, like a church? Once again, this alone cannot be the relevant distinction. Lee and Braunfeld demonstrate that activities without an explicitly religious purpose still implicate Free Exercise rights.
In noting that the claim presented by Hobby Lobby and Mardel may differ from that of a publicly traded company, Chief Judge Briscoe also implies that we have created some sort of problematic multi-factor test for future RFRA claims. See Briscoe Op. at 1171-73. But our holding simply reflects the facts presented here and explains their relevance to the statutory analysis.

. Congress intended the substantial burden tests in RFRA and RLUIPA to be interpreted uniformly. See Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 661 (10th Cir.2006).

. The Free Exercise interest in Lee would today be described in the RFRA context as a “substantial burden on religious exercise,” albeit one justified by a compelling government interest. See O Centro, 546 U.S. at 421, 126 S.Ct. 1211. Further, the government agreed at oral argument that it is correct to view Lee as a case in which the Court found a “substantial burden” for purposes of the framework in RFRA.

. "One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here____" Thomas, 450 U.S. at 715, 101 S.Ct. 1425. The assertion that life begins at conception is familiar in modern religious discourse, although of course not universally held. Moral culpability for enabling a third party’s supposedly immoral act is likewise familiar.

. At oral argument, the concern was raised whether our ruling here would permit Hobby Lobby and Mardel to withhold wages on religious grounds if they knew the wages would be used to purchase the objected-to contraceptives. This argument ignores the fact that the government can justify a substantial burden on religious exercise by demonstrating a compelling interest, and uniform enforcement of labor laws such as the Fair Labor Standards Act, which governs the payment of wages, would give rise to such an interest. See, e.g., Dole v. Shenandoah Baptist Church, 899 F.2d 1389, 1397-99 (4th Cir.1990). In a similar vein, Chief Judge Briscoe’s dissent suggests that this opinion has "opened the floodgates to RFRA litigation challenging any number of federal statutes that govern corporate affairs.” Briscoe Op. at 1174; see also Matheson Op. at 1181 n. 3. This argument similarly fails to acknowledge both RFRA's allowance that a narrowly tailored compelling interest can justify a substantial burden and RFRA's requirement that the belief be sincere. Cf. United States v. Quaintance, 608 F.3d 717 *1142 (10th Cir.2010) (rejecting an argument that RFRA barred the prosecution of members of a marijuana distribution conspiracy who claimed that use of the drug was central to their religious beliefs).

. At oral argument, the government relied upon language from Doremus v. Bd. of Ed. of Borough of Hawthorne, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), a taxpayer standing case. The Supreme Court denied the taxpayer standing to bring the claims, reasoning in part that “the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure.” Id. at 433, 72 S.Ct. 394. Doremus does not apply here because Hobby Lobby and Mardel do not bring their claims as taxpayers but rather as entities alleging injury from coercive government regulation. Thus, the taxpayer standing concerns animating the court’s Doremus decision are not implicated here.

. The district court relied on a test for substantial burden applied by the Seventh Circuit in Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752 (7th Cir.2003). As the district court noted, the Seventh Circuit used Civil Liberties to change the test for what constitutes "inhibition” of religious practice by defining inhibition as any government act that "bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable.” Id. at 761. But Abdulhaseeb does not accept this formulation.

. The government suggests on appeal that a limited number of women can only use the four contraceptives to which Hobby Lobby and Mardel object. The government did not raise this argument below nor has it provided any factual support for this claim. It is free to raise this argument below in permanent injunction proceedings.

. Judge Bacharach joins only Section VI(B)(1) of this Part.

. In many First Amendment cases, courts of appeal have weighed these additional factors in the first instance after having determined that the district court had erroneously denied the preliminary injunction on the likelihood-of-success element. See, e.g., Tenafly Eruv Ass’n, Inc. v. Borough of Tenafly, 309 F.3d 144, 178 (3d Cir.2002) (so holding in the context of a Free Exercise Claim); Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir.2003) (same in the context of Free Speech claim); ACLU of Illinois v. Alvarez, 679 F.3d 583, 589 (7th Cir.2012) (same), cert. denied, — U.S. —, 133 S.Ct. 651, 184 L.Ed.2d 459 (2012); see also Heideman v. S. Salt Lake City, 348 F.3d 1182, 1191 (10th Cir.2003) (addressing — in the context of an affirmance of a denial of a preliminary injunction on a Free Exercise claim — all the preliminary injunction factors, even though the district court seemed to only address likelihood of success) .