**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-6901**

_____

DARIUS VITKUS,

              Petitioner – Appellant,

      v.

ANTONY BLINKEN, Secretary of State; MERRICK GARLAND, Attorney General; NICK PROFFITT, U.S. Marshal for the Eastern District of Virginia; SEAN CASEY, Warden William G Truesdale Adult Detention Center,

              Respondents – Appellees.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Michael Stefan Nachmanoff, District Judge. (1:22-cv-00845-MSN-WEF)

_____

Argued: March 8, 2023                          Decided: August 24, 2023

_____

Before DIAZ, Chief Judge, and KING and QUATTLEBAUM, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge King wrote the majority opinion, in which Chief Judge Diaz joined. Judge Quattlebaum wrote a dissenting opinion.

_____

**ARGUED:** Fairuze Sofia, THE SOFIA LAW FIRM, PA, Fort Lauderdale, Florida, for Appellant. Rebecca Haciski, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Kenneth A. Polite, Jr., Assistant Attorney General, Bruce C. Swartz, Deputy Assistant Attorney General, Christopher S. Strauss, Office of International Affairs, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, Richmond, Virginia, Elizabeth A. Spavins, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

KING, Circuit Judge:

In this interlocutory appeal from the Eastern District of Virginia, petitioner Darius Vitkus — a citizen of the Republic of Lithuania — challenges the district court's denial of his request for a preliminary injunction. *See Vitkus v. Blinken*, No. 1:22-cv-00845 (E.D. Va. Aug. 5, 2022), ECF No. 13 (the "Injunction Denial"). By these proceedings, Vitkus seeks — in connection with his petition for habeas corpus relief under 28 U.S.C. § 2241 — to prevent the defendant government officials from carrying out his extradition to Lithuania.[1]

The district court denied Vitkus's request for injunctive relief, deeming him unlikely to succeed on the merits of his claim that his extradition to Lithuania would contravene the extradition treaty between that country and the United States. More specifically, Vitkus maintained that Lithuania's 2015 extradition request fails to comply with the treaty's mandate that Lithuania produce what is called "the charging document" (the "charging document contention"). The Injunction Denial ruled, however, that the documents produced by Lithuania comply with the extradition treaty, and that Vitkus is therefore not entitled to preliminary injunctive relief.

As explained herein, we are satisfied that Vitkus is likely to succeed on the merits of his claim that Lithuania's 2015 extradition request does not satisfy the charging

---

[1] The defendant government officials are Antony Blinken, Secretary of State; Merrick Garland, Attorney General; Nick Proffitt, U.S. Marshal for the Eastern District of Virginia; and Sean Casey, Warden, William G Truesdale Adult Detention Center. They are referred to herein as the "Secretary of State," or simply the "Secretary."

document mandate of the extradition treaty. Consistent with the foregoing, and because Vitkus is otherwise entitled to injunctive relief, we reverse the Injunction Denial and remand.

I.

For background and context, we begin our recitation of facts by describing the extradition treaty and Vitkus's suspected criminal conduct — that is, his putative extraditable conduct that underlies Lithuania's extradition request. We then review the extradition proceedings and related judicial proceedings heretofore conducted in the Southern District of Florida and the Eastern District of Virginia.[2]

A.

1.

In 2001, the United States of America entered into an extradition treaty with the Republic of Lithuania. *See* Lith. – U.S., Oct. 23, 2001, S. Treaty Doc. No. 107-4 (2002) (the "Treaty"). The Treaty provides for the extradition — at the request of either signatory — of "persons whom the authorities in the Requesting State have charged with . . . an extraditable offense." *Id.* art. 1. The Treaty identifies, inter alia, the offenses for which

---

[2] The facts spelled out herein are drawn from the record on appeal — that is, the various submissions and related exhibits filed in the habeas corpus proceedings conducted in the Eastern District of Virginia.

such a person may be extradited, the time frames within which an extradition request must be made, and the pertinent procedures for making such a request.

More specifically, in order to secure the extradition of a person who is sought for prosecution, the Requesting State (here, Lithuania) is obliged to transmit an extradition request to the Requested State (here, the United States).  Article 8 § 3 of the Treaty provides that

> 3.  A request for extradition of a person who is sought for prosecution also shall include:
>
> (a)     a copy of the warrant or order of arrest issued by a judge, court, or other authority competent for [that] purpose;
>
> (b)     a copy of *the charging document*; and
>
> (c)     such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

*See* Treaty art. 8 § 3 (emphasis added).  Although each of the foregoing requirements must be satisfied to fully support a request for extradition, the controlling issue with respect to the Injunction Denial is whether Lithuania's extradition request complied with Article 8 § 3(b)'s requirement that it include "a copy of *the charging document*," which we call the "charging document mandate."

2.

Vitkus is a citizen of Lithuania.  As a young man, he apparently supported and donated to a political party sometimes referred to as "the Russia party."  *See* J.A. 9.  In 2005, Vitkus began serving as a director of a real estate business in Lithuania called Gvidonas, GAB, which eventually fell into bankruptcy proceedings.  In March 2008, the

4

Lithuanian authorities initiated a criminal investigation into Vitkus's conduct as a director of that business (the "2008 investigation"). During the 2008 investigation, the Lithuanian authorities explored whether Vitkus had fraudulently induced another person to sell him an apartment. *Id.* at 126.[3]

According to Vitkus, the Lithuanian police issued a summons to him in 2009 concerning a bank loan Vitkus had obtained in 2005 but failed to repay. Instead of questioning Vitkus about the loan, however, Vitkus says that the Lithuanian police officers tied him to a chair, beat him, deprived him of water, and burned him with cigarettes. The officers further tortured Vitkus by placing a gas mask over his head, and intermittently restricting his air intake. During the torture incident, Vitkus recalls that he was questioned about his political activities. *See* J.A. 9.

In October 2009, the Lithuanian authorities initiated a second criminal investigation into Vitkus (the "2009 investigation"). The 2009 investigation was to examine three questions: (1) whether Vitkus had misappropriated funds from the real estate business while he was a director thereof; (2) whether Vitkus had failed to properly report his taxable income for 2008 and 2009; (3) and whether Vitkus had fraudulently sold an apartment that belonged to the real estate business. *See* J.A. 103.

In December 2009, Vitkus — living in Lithuania — received a document entitled "Notification of Suspicion," which informed him that he was a suspect in the 2009

---

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties to this appeal.

investigation. *See* J.A. 87. The Notification of Suspicion for the 2009 investigation identified the Lithuanian code provisions that Vitkus had allegedly violated, and it summarized his suspected criminal conduct. In December 2010, Vitkus received another Notification of Suspicion, this time advising him that he was a suspect in the 2008 investigation. *Id.* at 121. Vitkus later received an updated Notification of Suspicion concerning the 2009 investigation, detailing additional suspected criminal conduct (his third Notification of Suspicion). *Id.* at 89. Soon thereafter, Vitkus departed Lithuania, arriving in the United States in late December 2010.

In 2011, two orders of arrest were issued in Lithuania for Vitkus — then living in the United States — concerning the 2008 and 2009 investigations. *See* J.A. 117, 132. Around that time, the Lithuanian authorities launched a third criminal investigation into Vitkus's conduct as a director of the real estate business (the "2011 investigation"). The 2011 investigation concerned whether Vitkus had forged bank documents in 2007 to purchase an apartment. The 2011 investigation also related to whether Vitkus had forged power of attorney documents to enable the purchase of a commercial building, and whether he had used that property to fraudulently obtain a 2009 bank loan. *Id.* at 145.

Notably, the 2011 investigation resulted in the creation of a document by a prosecutor entitled "Decision to Recognize D. Vitkus as a Suspect," which we refer to as a "Suspect Decision." *See* J.A. 137. Therein, the Lithuanian prosecutor supervising the 2011 investigation certified that, based on the evidence gathered, it was proper to recognize Vitkus as a suspect in that investigation. The Suspect Decision described Vitkus's suspected criminal conduct and identified the implicated provisions of the Lithuanian

6

criminal code. Meanwhile, and also in 2011, a second Suspect Decision — detailing additional suspected illegal conduct by Vitkus in connection with the 2009 investigation — was issued. *Id.* at 79. Finally, in January 2012, an order of arrest was issued for Vitkus in Lithuania in connection with the 2011 investigation. *Id.* at 151.

In June 2012, Vitkus was placed into removal proceedings by the immigration authorities in the United States. In connection therewith, he applied for asylum, withholding of removal, and for protection under the Convention Against Torture (the "CAT"). The Board of Immigration Appeals (the "BIA") found in 2014 that Vitkus's "credible testimony established that he was beaten, burned, and nearly asphyxiated by [Lithuanian] police officers, who inquired into his contributions to a political party." *See* J.A. 28. Accordingly, the BIA ruled that Vitkus qualified for withholding of removal by the Attorney General, pursuant to the Immigration and Nationality Act (the "INA").

B.

1.

On May 7, 2015, the Lithuanian government formally requested — pursuant to the Treaty — the extradition of Vitkus from the United States to Lithuania. In its extradition request, Lithuania advised that Vitkus is suspected of criminal offenses and wanted for prosecution in Lithuania in connection with the 2008, 2009, and 2011 criminal investigations. More specifically, Lithuania — as the Requesting State — maintained that Vitkus is suspected of misappropriating property, committing fraud, evading taxes, and committing five acts of theft, plus four acts of forgery. In support thereof, Lithuania produced documents that summarized evidence gathered during the three investigations,

7

along with copies of three orders for Vitkus's arrest issued in connection with those investigations. As relevant here, Lithuania also provided the following documents: two Notifications of Suspicion issued in relation to the 2009 investigation; a Notification of Suspicion issued as part of the 2008 investigation; and two Suspect Decisions issued in the 2009 and 2011 investigations.

2.

On November 18, 2020, pursuant to 18 U.S.C. § 3184, the Secretary of State filed an extradition complaint in the Southern District of Florida, where Vitkus was then residing.[4] Extradition proceedings were thereafter conducted before a magistrate judge in that district, sitting as an "extradition court." The extradition complaint requested the court to certify that Vitkus is extraditable under the Treaty and to transfer the matter to the Secretary for a final determination concerning his extradition.

For his part, Vitkus presented the extradition court with three contentions in opposition to the extradition complaint. One of those was the charging document contention — i.e., that Lithuania had failed to produce "a copy of the charging document," as required by the charging document mandate. Vitkus also contended that, because the BIA found that Vitkus had been tortured in Lithuania, his extradition would contravene the

---

[4] Section 3184 of Title 18 provides, inter alia, that upon receipt of an extradition complaint, a "judge of the United States, or any magistrate judge authorized so to do by a court of the United States" may hear and consider evidence of criminality to determine whether "he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty." *See* 18 U.S.C. § 3184. If the judge finds the evidence sufficient, "he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State." *Id.* The judge may then also issue an arrest warrant.

INA and the CAT (the "immigration contention"). Third, Vitkus maintained that Lithuania had not shown probable cause that he had committed any of the suspected offenses (the "probable cause contention").

In July 2021, after briefing by the parties, the extradition court conducted a hearing on the extradition complaint. The magistrate judge thereafter assessed whether Vitkus's extradition to Lithuania would comply with the Treaty and the laws of the United States. On November 4, 2021, by its Order Certifying Extraditability and Order of Commitment, the court certified Vitkus's extradition and directed that he be committed to the custody of the United States Marshal. *See In re Extradition of Darius Vitkus*, No. 20-mc-62358 (S.D. Fla. Nov. 4, 2021), ECF No. 36 (the "Certification Order").

In rejecting Vitkus's charging document contention, the extradition court evaluated the competing legal positions of Vitkus and the Secretary of State. The Secretary argued that the only purpose of the charging document mandate is to identify the charges for which Lithuania seeks to extradite Vitkus, and that the mandate does not require the initiation of any criminal charges. According to the Secretary, the charging document mandate is satisfied by the Notifications of Suspicion and Suspect Decisions. The Secretary supported that position with an affidavit of an attorney at the Department of State (the "State Department Affidavit"), and with a letter from a Lithuanian official called the Prosecutor General (the "Prosecutor General Letter"). The State Department Affidavit averred that the Notifications of Suspicion and the Suspect Decisions are sufficient to satisfy the charging document mandate. And the Prosecutor General Letter maintained that the Notifications of Suspicion and Suspect Decisions "would be the equivalent of the charging

9

documents referred to in" the charging document mandate.  *See* J.A. 219.  The Letter also asserted that the proof required to identify a person as a suspect — and thus issue a Notification of Suspicion or Suspect Decision — "should not be of the same level as necessary to substantiate the judgment of conviction *or bringing charges* (this occurs at a later stage of the criminal proceedings)."  *Id*. (emphasis added).

Vitkus, for his part, maintained that the Notifications of Suspicion and Suspect Decisions fail — as a matter of law — to satisfy the charging document mandate.  Vitkus supported that position with evidence from a Lithuanian attorney named Henrikas Mackevicius, who testified that, under Lithuanian law, only one document — an "indictment" — can be a "charging document" for purposes of the charging document mandate.[5]  According to Mackevicius, the Notifications of Suspicion and Suspect Decisions, on the other hand, only inform a person that he or she "is suspected" of committing a criminal offense.  *See* J.A. 246.  As a result, Vitkus argued to the extradition court that the Notifications of Suspicion and Suspect Decisions fail to satisfy the charging document mandate.

Against this backdrop, the magistrate judge in Florida concluded in his November 2021 Certification Order that Lithuania had produced the documentation required to support its 2015 extradition request.  The Certification Order accepted the position of the

---

[5] Mackevicius allowed that a criminal prosecution can be initiated without an "indictment" in "the cases which are minor crimes and one person admits committing that minor offense."  *See* J.A. 258.  But he testified that only an indictment could initiate a prosecution in Vitkus's case.  *Id.* at 258-59.

10

State Department that "there is no requirement . . . that the charging document take any particular form." *See* Certification Order 7. And after observing that "ambiguities in the extradition context should be resolved in favor of extradition," the magistrate judge reasoned that deference was warranted to the Treaty interpretation of the Secretary of State and supported by Lithuania. *Id.* Pursuant to that interpretation, the magistrate judge ruled that the Notifications of Suspicion and Suspect Decisions "are sufficient to meet the requirements of" the charging document mandate. *Id.* at 9.[6]

3.

In December 2021, less than a month after the Certification Order was issued, Vitkus filed a petition for habeas corpus relief under 28 U.S.C. § 2241 in the Southern District of Florida.[7] In that petition, Vitkus alleged his probable cause contention and his immigration contention — not raising the charging document contention. On March 22,

---

[6] The Certification Order also resolved Vitkus's probable cause and immigration contentions against him. Addressing the probable cause contention, the Order determined that Lithuania had provided sufficient information to establish probable cause that Vitkus had committed the offenses specified in the 2015 extradition request. Rejecting the immigration contention, the Certification Order concluded that the decisions of the BIA were not binding on the extradition court, and thus could not be interposed as a bar to the certification of Vitkus's extraditability. The judge observed, however, that Vitkus could raise his torture argument with the Department of State.

[7] Section 2241 of Title 28 extends the right to pursue relief by way of habeas corpus to a prisoner who is "in custody in violation of the . . . treaties of the United States." *See* 28 U.S.C. § 2241(c)(3); *see also Yoo v. United States*, 43 F.4th 64, 71 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 576 (2023).

11

2022, following briefing and argument, the Florida district court rejected Vitkus's habeas corpus claim.

On July 5, 2022, the Secretary of State authorized Vitkus's extradition to Lithuania. One week later, on July 12, Vitkus requested the Florida district court to reopen his petition for habeas corpus relief to reconsider the immigration contention. On July 19, that request was denied. Vitkus, who had been in custody in Florida since November 2021, was then transferred to a federal detention facility in Virginia and his extradition to Lithuania was scheduled for August 11, 2022.

4.

After the Florida proceedings had been completed in July 2022, Vitkus received two letters from Lithuanian prosecutors that bear on and support his charging document contention. On July 20, 2022, Vitkus received — through his Lithuanian lawyer — a letter from the Lithuanian prosecutor overseeing the 2009 investigation, advising that "there is no procedural decision to close the case with an indictment in the pre-trial [2009 investigation]." *See* J.A. 291. Six days later, on July 26, Vitkus received a second letter from the Lithuanian prosecutor supervising the 2008 investigation, advising that "no indictment has been drawn up in the pre-trial [2008 investigation]." *Id.* at 460.

That very day, on July 26, 2022, Vitkus filed his pending petition for habeas corpus relief under 28 U.S.C. § 2241 — also seeking declaratory and injunctive relief — in the Eastern District of Virginia. Vitkus maintained therein that he is entitled to habeas corpus

12

relief on three grounds — the charging document contention, the immigration contention, and the probable cause contention.

The following day, July 27, 2022, Vitkus moved the Virginia district court for a temporary restraining order (a "TRO") barring his extradition. In his TRO request, Vitkus pursued two grounds — the charging document contention and the immigration contention. A hearing was conducted in the Virginia district court on August 5. At that time, Vitkus also moved for his TRO request to be converted to a motion for a preliminary injunction. By the Injunction Denial — filed immediately after the August 5 hearing — the Virginia district court granted Vitkus's motion to convert his TRO request into a motion for a preliminary injunction. The court also denied Vitkus's request for preliminary injunctive relief.

The Injunction Denial ruled that Vitkus was unlikely to succeed on the merits of either his charging document contention or his immigration contention. In rejecting the charging document contention, the court assessed a voluminous group of documents that had been filed by Vitkus to support his habeas corpus petition, including a transcript of the proceedings before the extradition court (in particular, the Mackevicius testimony); portions of the Lithuanian criminal code; the Prosecutor General Letter; the State Department Affidavit; plus the two letters received by Vitkus's Lithuanian lawyer from separate Lithuanian prosecutors in late July 2022 (confirming that Vitkus had not been indicted in Lithuania in connection with the 2008 and 2009 investigations).

In explaining its rejection of the charging document contention, the Injunction Denial recited that it gave "great weight" to the Treaty interpretation presented by the

13

Secretary of State — that the charging document mandate does not require a charging document that is analogous to an indictment under American law. *See* Injunction Denial 6. That interpretation, the Injunction Denial explained, was supported by the State Department Affidavit and the Prosecutor General Letter. The Injunction Denial agreed with the Secretary of State that the charging document mandate does not require any specific form of charging document, and that the mandate can be satisfied by a document identifying "the violations of Lithuanian law that form the basis of Mr. Vitkus's extradition, and . . . describ[ing] the facts underlying those alleged violations." *Id*. Accordingly, the Injunction Denial ruled that the Notifications of Suspicion and Suspect Decisions provided and relied on by Lithuania are sufficient to satisfy the charging document mandate of the Treaty. As a result, the district court concluded that Vitkus was unlikely to succeed on the merits of the charging document contention alleged in his habeas corpus petition.[8] Vitkus's request for injunctive relief was therefore denied.

On August 9, 2022, Vitkus noticed this interlocutory appeal. And we possess jurisdiction therein pursuant to 28 U.S.C. § 1292(a)(1) (authorizing interlocutory appeal from decision of district court refusing to issue an injunction). Two days later, on August

---

[8] In rejecting the immigration contention, the Injunction Denial recognized that asylum and extradition are rooted in distinct sources of law. It then concluded that "nothing under the [INA] prevents the Secretary of State from authorizing Mr. Vitkus's removal." *See* Injunction Denial 7. The district court also resolved that the BIA's determination that Vitkus qualified for withholding of removal in the immigration context is not binding in a judicial review of an extradition certification. The court thus ruled that Vitkus had failed to demonstrate a likelihood of success on the merits of his immigration contention, also precluding preliminary injunctive relief on that basis.

11, Vitkus's extradition to Lithuania was stayed by our Court, pending resolution of this appeal.

## II.

On appeal, Vitkus contends that he is entitled to an award of preliminary injunctive relief and that such relief was erroneously denied by the district court. More specifically, Vitkus maintains that he is likely to succeed on the merits of the charging document contention and that he can otherwise satisfy the factors required for such an award, as outlined by the Supreme Court in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (specifying factors plaintiff must satisfy to obtain preliminary injunctive relief). In support of his assertion that the charging document contention is likely to succeed on its merits, Vitkus maintains that the charging document mandate — set forth in Article 8 § 3(b) of the Treaty — plainly and unambiguously requires Lithuania to produce a copy of the document that has initiated criminal charges against him in that country.

The Secretary of State responds that Lithuania has complied with the charging document mandate. Similar to Vitkus, the Secretary maintains that the language of the charging document mandate is plain and unambiguous. The Secretary maintains, however, that the charging document mandate does not require production of any particular type of charging document, and that it does not demand production of an indictment or something similar. According to the Secretary, the charging document mandate only requires the Requesting State to produce documents that sufficiently detail the alleged criminal violations and conduct, such as the Notifications of Suspicion and Suspect Decisions. The

15

Secretary argues that the federal courts have consistently interpreted other treaties made by the United States to allow for extradition of persons who have not actually been criminally charged. Finally, the Secretary insists that, if the relevant text of the Treaty is ambiguous, his proposed construction thereof — that the charging document mandate requires only a document detailing suspected criminal conduct — adheres to the Treaty's requirements and is entitled to deference.

As explained herein, we agree with Vitkus that the Treaty's charging document mandate plainly and unambiguously requires Lithuania to support an extradition request with an indictment — or some comparable legal instrument — that has initiated criminal charges against Vitkus in that country. Because the Notifications of Suspicion and Suspect Decisions fail in that respect, they cannot be "the charging document" required by the charging document mandate. Accordingly, Vitkus is likely to succeed on the merits of the charging document contention.

## A.

### 1.

As relevant here, the Supreme Court has recognized that a preliminary injunction is "an extraordinary remedy [that is] never awarded as of right." *See Winter*, 555 U.S. at 24. To prevail on a request for preliminary injunctive relief, a plaintiff must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm

in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20.

Notably, a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors. *See Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018). In such a situation, however, a court of appeals reviewing that denial should "perform [its] own assessment of the factors not addressed by the district court." *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019) (citing *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc)); *see also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (evaluating and resolving unaddressed preliminary injunction factors in first instance after ruling that district court erroneously denied preliminary injunction on likelihood-of-success element).

When a district court has denied a request for preliminary injunctive relief, we review that decision for an abuse of discretion. *See Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). In conducting such a review, we assess the court's legal conclusions de novo. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). Important here, a court "abuses its discretion in denying preliminary injunctive relief when it . . . misapprehend[s] the law with respect to underlying issues in litigation." *See In re Search Warrant*, 942 F.3d at 171 (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013)).

2.

In evaluating the Virginia district court's Injunction Denial, we are mindful that the Florida magistrate court's Certification Order is "presumptively valid." *See Skaftourous*

17

*v. United States*, 667 F.3d 144, 158-59 (2d Cir. 2011). Because a certification order is not a final appealable order under 28 U.S.C. § 1291, an extraditee (such as Vitkus) can only challenge such an order in federal court by pursuing habeas corpus relief under 28 U.S.C. § 2241. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021). To succeed on a § 2241 habeas corpus petition, the extraditee must demonstrate that "he is in custody in violation of . . . the applicable extradition treaty." *See Yoo v. United States*, 43 F.4th 64, 71 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 576 (2023).

To aid our analysis of whether Vitkus is likely to show that he is being held in violation of the Treaty, we will spell out some principles of treaty interpretation. On that score, the Supreme Court has recognized that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *See Medellin v. Texas*, 552 U.S. 491, 506 (2008); *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty . . . we first look to its terms to determine its meaning."). More specifically, a treaty must be interpreted "in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of its object and purpose." *See Aguasvivas*, 984 F.3d at 1058. To that end, "[w]hen the parties to a treaty both agree as to the meaning of a treaty provision, *and that interpretation follows from the clear treaty language*, we must . . . defer to that interpretation." *See Sumimoto Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1982) (emphasis added). On the other hand, as our colleagues in the First Circuit recently ruled, the converse is also true. That is, "if the [treaty's] textual meaning is plain and cannot reasonably bear the government's construction, then we must reject that construction." *See Aguasvivas*, 984 F.3d at 1058.

18

B.

Against this backdrop of legal principles, we will assess whether the Virginia district court abused its discretion in concluding that Vitkus is not likely to succeed on the merits of the charging document contention.  In so ruling, the court adopted the construction of the phrase "the charging document" sponsored by the Secretary of State and supported by Lithuania — that is, any document that "identif[ies] the violations of Lithuanian law that form the basis of Mr. Vitkus's extradition, [and that] describes the facts underlying those alleged violations."  *See* Injunction Denial 6.  Because the Secretary's construction of the charging document mandate does not "follow[] from the clear [T]reaty language," we are satisfied that the district court erred as a matter of law in adopting it.  *See Sumimoto*, 457 U.S. at 185.

1.

a.

We begin our evaluation with the plain language of the Treaty, which, under the Constitution, is part of "the supreme Law of the Land."  *See* U.S. Const. art. 6, cl. 2.  Article 1 of the Treaty specifies that "persons whom the authorities in the Requesting State have charged with" a qualifying crime are eligible to be extradited.  *See* Treaty art. 1.  Before an extradition of a person "sought for prosecution" can proceed, however, Article 8 § 3 of the Treaty requires production by the Requesting State of:

> (a)     a copy of the warrant or order of arrest issued by a judge, court, or other authority competent for [that] purpose;
>
> (b)     a copy of *the charging document*; and

19

(c)     such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

*Id.* art. 8 § 3 (emphasis added).  Those requirements identify "the proof required under the Treaty to establish that an individual has been 'charged' with a crime."  *See Sacirbey v. Guccione*, 589 F.3d 52, 67 (2d Cir. 2009).  Thus, under the Treaty, Lithuania can only establish that Vitkus has been "charged" with a crime if it can satisfy each requirement of Article 8 § 3.  As relevant here, the Secretary of State is not entitled to extradite Vitkus unless Lithuania first produces — in support of its extradition request and consistent with Article 8 § 3(b) of the Treaty — a copy of "the charging document."[9]

By requiring "*the* charging document," it is evident that the charging document mandate of the Treaty requires a discrete document that initiates criminal charges.  *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482-83 (2021).  As the Supreme Court emphasized in *Niz-Chavez*, when "an article [is] coupled with a singular noun," that "combination . . . suggest[s] a discrete document."  *Id.*  Applying that rule here, the definite article ("the") coupled with a singular noun ("charging document") indicates that "the charging document" refers to the document that has initiated criminal charges against a person.  Accordingly, the charging document mandate is plain and unambiguous, and it cannot be fulfilled by some document (or set of documents) that fails to perform the charging function — even if it or they contain similar information to "*the* charging document."  *See Sacirbey*,

---

[9] Vitkus does not contest that Lithuania's 2015 extradition request complies with the other two requirements of Article 8 § 3 of the Treaty.  Our analysis thus focuses solely on whether the charging document mandate of Article 8 § 3(b) is satisfied.

20

589 F.3d at 69 (ruling that extradition could not proceed because Requesting State had — instead of providing "*the* arrest warrant" — produced merely a letter asserting intent to prosecute); *Aguasvivas*, 984 F.3d at 1058-59 (concluding that arrest warrant fails to satisfy requirement for "the document setting forth the charges," because it does not indicate that criminal charges were initiated).

b.

i.

Our determination that "*the* charging document" is plainly and unambiguously an instrument which initiates a criminal charge against a person is also consistent with federal law. Indeed, the term "charging document" is defined in the Federal Rules of Criminal Procedure as "an indictment, information, or complaint." *See* Fed. R. Crim. P. 58(b)(1). Although those documents can take a different form, it is clear from the applicable Rules that each form of charge initiates a criminal prosecution against a defendant. *See, e.g.*, Fed. R. Crim. P. 7(a)(1), 58(b)(1).[10] Here, "the charging document," as specified in Article 8 § 3(b) of the Treaty, necessarily refers to the document that performs the same function as an indictment, information, or complaint in this Country. *Cf. Aguasvivas*, 984 F.3d at 1059 (finding separate requirements for a warrant and "a copy of the document setting forth the

---

[10] An "indictment" or "information" is defined by Rule 7(c)(1) of the Criminal Rules as a "plain, concise, and definite written statement of the essential facts constituting the offense *charged*." *See* Fed. R. Crim. P. 7(c)(1) (emphasis added). Meanwhile, a "complaint" is similarly defined as "a written statement of the essential facts constituting the offense *charged*." *See* Fed. R. Crim. P. 3 (emphasis added). Pursuant to both definitions, those documents initiate criminal charges.

21

charges" consistent with the customary practice in the United States and the Dominican Republic to "employ warrants to arrest and separate documents to charge").

ii.

The Notifications of Suspicion and Suspect Decisions relied on by the Secretary of State are much more akin to what the Department of Justice (the "DOJ") calls "subject letters" and "target letters," which are consistently used by federal prosecutors in the United States. Those letters are routinely utilized by the DOJ to advise putative defendants that they are either a "subject" or a "target" of a federal criminal investigation. But subject and target letters do not perform any charging function. *See, e.g.*, *United States v. Ealy*, 363 F.3d 292, 295 (4th Cir. 2004) (defining "target letter" as a writing "advising [a target] that an investigation had uncovered evidence linking him to the commission of a federal crime").

The controlling policies of the Department of Justice — which represents the Secretary of State in these court proceedings — confirm the foregoing and strongly support Vitkus in this appeal. A "subject" is defined therein as "a person whose conduct is within the scope of the grand jury's investigation." *See* U.S. Dep't of Just., Justice Manual, § 9-11.151 (2020).[11] Meanwhile, a "target" is "a person as to whom the prosecutor . . . has substantial evidence linking him or her to the commission of a crime and who . . . is a

---

[11] It is worth emphasizing that, although the Justice Manual "does not . . . create any rights, substantive or procedural," it identifies "publicly available Department of Justice . . . policies and procedures," and "provides internal . . . guidance" to federal prosecutors of all stripes. *See* U.S. Dep't of Just., Justice Manual, §§ 1-1.100, 1.200 (2020).

putative defendant." *Id.* Critically, those identified as federal "subjects" and "targets" of criminal investigations have not been charged — unless and until they become defendants by virtue of an indictment, an information, or a complaint. The Notifications of Suspicion and Suspect Decisions relied on by the Secretary of State did not initiate criminal charges against Vitkus. They simply characterize him as a suspect, and thus do not satisfy the plain and unambiguous language of the Treaty's charging document mandate.

2.

Consistent with the foregoing, the Prosecutor General Letter (produced here by the Secretary of State) verifies that the Notifications of Suspicion and Suspect Decisions are not supported by the level of proof "necessary [for] . . . bringing charges." *See* J.A. 219. And, as lawyer Mackevicius confirmed to the extradition court, such Notifications and Decisions are commonly issued during pre-trial investigations to alert persons that they are suspected in criminal investigations and to inform them of suspected illegal conduct.

It is also revealing that the three Lithuanian investigations concerning Vitkus remain in a pretrial investigation stage — and that no document provided by Lithuania has initiated any criminal charges. The Prosecutor General Letter confirms that "[t]he [three] criminal matters in which the request for extradition of Darius Vitkus is made, are currently in the first stage of criminal procedure . . . [which] is referred to as pre-trial investigation." *See* J.A. 219.[12] That same letter distinguishes between the sufficiency of evidence needed to

---

[12] Notably, the Prosecutor General Letter explains that, during the pretrial investigation stage, Vitkus is "referred to as a suspect," which it defines as "a participant in the pre-trial investigation." *See* J.A. 219. The Prosecutor General Letter concedes that, (Continued)

confer the status of "suspect" and that needed to "bring[] charges," which "occurs at a later stage of the criminal proceedings." *Id.* Finally, two recent letters from Lithuanian prosecutors further explain that "no indictment has been drawn up [as to Vitkus] in the [2008] pre-trial investigation," *id*. at 460, and that "there is no procedural decision to close the [Vitkus] case with an indictment in the [2009] pre-trial investigation," *id.* at 291. In these circumstances, the Notifications of Suspicion and Suspect Decisions fail to satisfy the charging document mandate.

C.

1.

Resisting the plain language of the charging document mandate, the Secretary of State first turns to Article 1 of the Treaty, which provides for the extradition of "persons whom the authorities in the Requesting State have *charged with* . . . an extraditable offense." *See* Treaty art. 1 (emphasis added). According to the Secretary, the "charged with" language of Article 1 — which appears in several other extradition treaties — has been interpreted by courts to support the extradition of persons who have not yet been criminally charged. The Secretary thus contends that we should adhere to those interpretations of the term "charged with," and approve the extradition of Vitkus, even though he has not been criminally charged. The charging document mandate in this Treaty precludes us from accepting that interpretation, however, and it must be rejected.

---

if Vitkus's case proceeds to the trial stage, he will acquire "the procedural status of an accused." *Id.*

To be sure, we take no issue with the Secretary of State's contention that he has, pursuant to other treaties, extradited persons not yet criminally charged. *See, e.g.*, *In re Assarsson*, 635 F.2d 1237 (7th Cir. 1980) (extradition to Sweden without criminal charges); *Emami v. U.S. Dist. Ct. for N. Dist. Calif.*, 834 F.2d 1444 (9th Cir. 1987) (extradition to Germany without criminal charges); *In re Extradition of Saranello*, 142 F. Supp. 3d 1182 (W.D. Okla. 2015) (extradition to Mexico without criminal charges); *In re Extradition of Handanovic*, 829 F. Supp. 2d 979 (D. Or. 2011) (extradition to Bosnia and Herzegovina without criminal charges). Several of those cases, however, involved treaties that did not contain a charging document mandate. As the Seventh Circuit reasoned in its *Assarsson* decision, "[s]ince the parties chose not to require production of the charge document, we can easily infer that they did not require the 'substance' of a charge either." *See Assarsson*, 635 F.2d at 1243; *see also Emami*, 834 F.2d at 1448 (concluding no criminal charges required because no treaty requirement for charging document); *Saranello*, 142 F. Supp. 3d at 1186 n.2 (same); *Handanovic*, 829 F. Supp. 2d at 987 (same).

In addition to treaties characterized by the *absence* of a charging document mandate, some treaties reference a charging document but do so in a way that provides greater flexibility. Certain extradition treaties, for example, include a provision for the production of "a copy of the charging document, *if any*." *See, e.g.*, Extradition Treaty, Austria – U.S. art. 10, § 3, Jan. 8, 1998, T.I.A.S. No. 12916 (emphasis added). Other extradition treaties have apparently demanded "*a* document setting forth the charges." *See* Extradition Treaty, Chile – U.S., art. 8, §3(b), June 5, 2013, T.I.A.S. No. 16-1214 (emphasis added). In those

25

situations, the plain treaty language permits the extradition of a person without production of the discrete document initiating criminal charges.

We acknowledge that one of our sister circuits recently held that the Secretary of State could extradite the former president of Peru, who had not been formally charged. *See Manrique v. Kolc*, 65 F.4th 1037 (9th Cir. 2023). The extradition treaty between the United States and Peru contains the same charging document mandate as the Treaty here. *See* Extradition Treaty, Peru – U.S., art. VI, § 3(b), July 26, 2001, T.I.A.S. No. 03-825 (requiring "a copy of the charging document"). But for the reasons discussed, we simply do not agree with the Ninth Circuit's assessment that the inclusion of the charging document mandate "makes no difference." *See Manrique*, 65 F.4th at 1042.[13]

As the Seventh Circuit observed in *Assarsson*, "[i]f the parties had wished to include the additional requirement that a formal charging document . . . be produced, they could have so provided." *See* 635 F.2d at 1243. Put succinctly, the parties to this Treaty did just

---

[13] The drafting history of the treaty between the United States and Peru—signed by the parties thereto in July of 2001—contains a Technical Analysis. The Analysis explains that the parties

> intended that 'charged' persons include those who are sought for prosecution for an extraditable offense based on an outstanding warrant of arrest, regardless of whether such warrant was issued pursuant to an indictment, complaint, information, affidavit, or other lawful means for initiating an arrest for prosecution under the laws in Peru or the United States.

*See Manrique*, 65 F.4th at 1043. The Ninth Circuit characterized this explanation as "strong evidence that 'charged with' refers generally to any accusation." *Id.* No such statement exists, however, in the drafting history of the Treaty at issue here, which was signed by the United States and Lithuania only three months later, in October of 2001.

that. And undeniably, the Treaty language agreed to by the parties must be adhered to and carry the day. *See Aguasvivas*, 984 F.3d at 1060 ("When, subsequent to *Assarsson* and *Emami*, the Dominican Republic and the United States added to the list of required documents 'the document setting forth the charges,' a strong inference arose supporting the conclusion that this treaty requires more than an arrest warrant describing a *suspected but yet-to-be charged* crime." (emphasis added)). Despite "charged with" being contained in Article I of this Treaty, the charging document mandate of Article 8 § 3(b) plainly and unambiguously "eliminates the permission to proceed without [production of] such a document." *See Aguasvivas*, 984 F.3d at 1061. And because a Requesting State (here, Lithuania) cannot produce "the charging document" when no criminal charges have been filed, the Treaty does not permit the extradition of a person not yet criminally charged. At bottom, there is "no better evidence of a 'substantive' requirement of a charge . . . than a copy of the 'charge' itself." *See Assarsson*, 635 F.2d at 1243.[14]

## 2.

Finally, the Secretary of State maintains that we are obliged to defer to his interpretation of the Treaty, even if we would not adopt that construction de novo. Of course, "[i]f the treaty's text is ambiguous and reasonably accommodates the United States' construction," we should defer to the Secretary's interpretation. *See Aguasvivas*, 984 F.3d

---

[14] We have no authority to rewrite Treaty terms agreed to by the parties. If the Treaty parties wanted to extradite suspects and targets of criminal investigations, the Treaty could have so provided. Put simply, Lithuania agreed to — and is therefore required to — produce "a copy of *the* charging document."

at 1058. But that is not the situation with respect to the charging document mandate. The charging document mandate is "plain and cannot reasonably bear the [Secretary's] construction." *Id.* In that instance, we do not owe deference to the Secretary. The district court thus erred as a matter of law in adopting the Secretary's interpretation of the charging document mandate of the Treaty.

* * *

To summarize, the charging document mandate spelled out in Article 8 § 3(b) of the Treaty requires the production of a discrete charging document — that is, the instrument (comparable to an indictment, information, or complaint) that has initiated criminal charges against Vitkus. And, in these circumstances, the Notifications of Suspicion and Suspect Decisions have not initiated criminal charges against Vitkus. As a result, those documents are not "*the* charging document" required by Article 8 § 3(b), and Vitkus is likely to succeed on the merits of the charging document contention.[15]

D.

Having concluded that the Virginia district court's determination on the first preliminary injunction factor — that is, likelihood of success on the merits — was a legal error that constitutes an abuse of discretion, we turn to the unaddressed *Winter* factors. *See In re Search Warrant*, 942 F.3d at 171 (recognizing that court of appeals should "perform [its] own assessment of the factors not addressed by the district court"). More specifically,

---

[15] Because Vitkus is likely to prevail on the charging document contention, we need not and thus do not evaluate the immigration contention addressed and rejected by the Virginia district court.

28

we will evaluate whether Vitkus has shown "[2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *See Winter*, 555 U.S. at 20.

1.

First, on the irreparable harm factor, Vitkus's extradition to Lithuania would be irreversible and moot his petition for habeas corpus relief. As one of our sister circuits has recognized, "the possibility of irreparable injury . . . is evident: [the] appeal will become moot and will be dismissed since the extradition will have been carried out." *See Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986). Because Lithuania's extradition request is not in compliance with the Treaty, Vitkus's extradition during ongoing litigation would effectively deny him any ability to obtain permanent relief. And such a denial would constitute irreparable harm to Vitkus.

2.

As to the third and fourth *Winter* factors — the balance of the equities and the public interest — we are obliged to assess those factors in tandem when the government (i.e., the Secretary of State) is the opposing party. *See Winter*, 555 U.S. at 26 (considering balance of equities and public interest together). To that end, the public undeniably has an interest in the Secretary's ability to secure the extradition of suspected or charged criminals to this Country, which could be threatened by his "[f]ailure to comply with foreign nations' proper extradition requests." *See Venckiene v. United States*, 929 F.3d 843, 865 (7th Cir. 2019). And we recognize that the Secretary's compliance with *valid* extradition requests "promotes relations between . . . countries, and enhances efforts to establish an

29

international rule of law and order." *See Artukovic*, 784 F.2d at 1356. On the other hand, the public "undoubtedly has an interest in seeing its governmental institutions follow the law." *See Roe*, 947 F.3d at 230-31.

In these circumstances, Vitkus has demonstrated that Lithuania's 2015 extradition request to return him to that country does not satisfy the Treaty's requirements. And the public's interest in the Secretary of State recognizing and fulfilling Treaty obligations outweighs any detrimental impact that the denial of an improper extradition request could have. We are thus satisfied that the balance of the equities and the public interest both weigh in favor of Vitkus.

III.

Pursuant to the foregoing, we reverse the Injunction Denial of the Virginia district court and remand for such other and further proceedings as may be appropriate.

*REVERSED AND REMANDED*

30

QUATTLEBAUM, Circuit Judge, dissenting:

This appeal boils down to whether the district court abused its discretion in denying Darius Vitkus' motion to enjoin the Secretary of State from extraditing him to Lithuania. Under its treaty with the United States, Lithuania seeks to extradite Vitkus for various financial crimes he allegedly committed before he left that country for the United States. To do so, the treaty requires Lithuania to, among other things, provide "the charging document" to the United States. Although Vitkus had not been formally charged with criminal violations, Lithuania produced documentation that it contends satisfies the treaty's charging document requirement. The Secretary agreed and determined that Vitkus should be extradited. So it petitioned an extradition court for an order allowing it to do so.

At the extradition hearing, Vitkus and the Secretary presented evidence and arguments about the meaning of "the charging document." Vitkus insisted "the charging document" required a formal charge, like an indictment. The Secretary countered that a formal charge was not required and that the documents Lithuania provided were sufficient. Ultimately, the extradition court found the Secretary's evidence and arguments more persuasive. The extradition court thus certified Vitkus for extradition.

Vitkus then petitioned for a writ of habeas corpus in district court, challenging the extradition court's certification order. The court denied the petition.

31

After the Secretary of State authorized Vitkus' surrender to Lithuanian authorities, Vitkus petitioned again for habeas relief and moved for a preliminary injunction[1] enjoining the Secretary from extraditing him to Lithuania. Considering basically the same evidence and arguments the extradition court and first habeas court considered, the district court denied the motion. The court found Vitkus had not established a likelihood of success on his claim that Lithuania failed to comply with the treaty.

The majority reverses that decision, concluding that Vitkus is likely to succeed on the merits of his claim that Lithuania's request does not satisfy the charging document requirement. This means, as the majority sees it, the Secretary's interpretation of "the charging document"—which had been adopted by the extradition court and two district courts—was not even plausible. As a result, the majority imposes the extraordinary relief of enjoining the Secretary of State from carrying out its obligation under the treaty to extradite Vitkus to Lithuania.

---

[1] In his motion for a preliminary injunction, Vitkus identified the preliminary injunction standard in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). J.A. 303; *id.* at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). Since his requested relief was a stay of extradition, he also asserted that the court was required to consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." J.A. 303 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). As the Supreme Court has recognized, there is "substantial overlap between these factors and the factors governing preliminary injunctions." *Nken*, 556 U.S. at 434 (citing *Winter*, 555 U.S. at 24).

I disagree. The district court's interpretation of the treaty charging document requirement was plausible. So even if Vitkus' reading of it was as well, the district court did not abuse its discretion. And the district court's decision to side with the Secretary's interpretation over Vitkus' faithfully applies Supreme Court precedent requiring deference to the Secretary. I would affirm the district court's denial of Vitkus' motion for a preliminary injunction.

## I.

The critical portion of the treaty is Article 8. It sets forth the procedural requirements for extradition and contains a list of required documents the "Requesting State" must produce when submitting a "request for extradition of a person who is sought for prosecution." J.A. 47–48. Article 8(3) of the treaty required Lithuania, as the Requesting State, to produce, "(a) a copy of the warrant or order for arrest issued by a judge, court, or other authority competent for this purpose; (b) a copy of the charging document; and (c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought." J.A. 48.

Consistent with the treaty, Lithuania requested the United States Department of State's assistance in extraditing Vitkus for prosecution related to seven separate schemes involving theft, fraud and tax evasion in violation of the Criminal Code of Lithuania.

In support of its extradition request, Lithuania produced three "Notifications of Suspicion" and two "Decisions" to recognize Vitkus as a suspect. J.A. 77–91, 120–21, 134–40. The Notifications of Suspicion are issued by an investigator and the Decisions are

33

issued by a prosecutor. Under Lithuania's Criminal Procedure Code, an individual suspected of violating the law must be served with a Notification of Suspicion or the prosecutor's Decision to recognize him or her as a suspect before the individual may be interrogated. Each of these documents includes the alleged "criminal offense (place, time and other circumstances) and criminal law providing for the criminal offense, as well as the suspect's rights." J.A. 219.[2]

But Vitkus maintains that Lithuania has failed to produce the required "charging document" because "[he] has never been charged with any of the crimes for which extradition is sought" and that the case against him "remain[s] in the investigation phase." Op. Br. 9, 14. At the extradition hearing, Vitkus presented testimony from Henrikas Mackevicius, a criminal lawyer in Lithuania. Mackevicius testified that the "Notifications of Suspicion" provided by the Lithuanian government do not satisfy the requirements of Article 8. J.A. 269. He further testified that the cases against Vitkus are in the investigation phase and, therefore, no charging document could have been issued.

The problem with this position, however, is that the treaty does not define "the charging document." And while those familiar with the United States legal system might naturally think of a charging document as something formal like a criminal complaint or an indictment, the Secretary produced evidence supporting a broader interpretation of that phrase in the context of an international extradition treaty.

---

[2] Lithuania also produced arrest warrants for Vitkus.

34

In the proceedings below, the Secretary provided a letter from the Lithuanian Chief Prosecutor explaining Lithuanian criminal procedure, which stated that the extradition request contains the necessary charging documents under the treaty. In the letter, the Chief Prosecutor points out that notifications of suspicion recognize a person as a suspect, identify the violations of Lithuanian law for which Vitkus' extradition is sought and describe the facts related to the suspected legal violations. And the letter adds that "a notification of suspicion or a decision of a prosecutor to recognize a person as a suspect would be the equivalent of the charging document referred to in Article 8(3)(b) of the [Treaty and Annex] under the criminal procedure law of the Republic of Lithuania." J.A. 219.

The Secretary also submitted the affidavit of Tom Heinemann, an attorney advisor for the Department of State. *In re Extradition of Vitkus*, No. 20-62358-MC-PMH, Dkt. No. 32-2 (S.D. Fla. June 25, 2021) (Heinemann Aff.).[3] In the affidavit, Heinemann attests that he works for the Office of Enforcement and Extradition, the office responsible for extradition, "including the negotiation and implementation of extradition treaties." *Id.* at 1. Heinemann explained that the Treaty describes "two broad categories" of people who may be extradited—those that have been "charged with or convicted of an extraditable offense" (Article 1) and those that are "sought for prosecution" (Article 8). *Id.* And the "sought for

---

[3] In its response brief, the government explains that "[d]ue to the emergency nature of the proceedings below and the fact that Vitkus did not contest the State Department's position on the treaty, the full declaration was not submitted as an exhibit" before this court. Resp. Br. 13 n.5.

prosecution" category applies to "persons wanted for prosecution by Lithuania, such as Vitkus, who are wanted to stand trial for specific crimes, but for whom a formal charging document akin to the ones used in the United States may not have been issued." *Id.*

According to Heinemann, this language appears in many other bilateral extradition treaties. He explained that the language is necessary because "some of the United States treaty partners are unable as a legal matter to formally charge a suspect until that suspect appears in that country for some form of legal proceeding." *Id.* In fact, at oral argument, the Secretary of State explained that a formal indictment cannot be sought under Lithuanian law until the prosecution receives Vitkus' position on the notification of suspicion documents. Consistent with that, Heinemann stated that "the United States has regularly extradited fugitives when they are suspected of having committed a crime or crimes, and are wanted for prosecution in the other country, even though they have not been formally charged as that term is understood in U.S. criminal law." *Id.* Thus, the Secretary insists that the documents submitted by the Lithuanian government satisfy the treaty's requirements under Article 8.

After considering the parties' competing interpretations of the charging document requirement and Supreme Court precedent requiring deference to the Secretary's position, the district court denied Vitkus' motion for a preliminary injunction. It concluded that Vitkus had not shown that it was likely that he could succeed on his claim that Lithuania failed to satisfy the treaty's requirements.

36

II.

On appeal, Vitkus continues to argue that the treaty requires a formal charging document like an indictment. And I agree that Vitkus' interpretation of "the charging document" is plausible. But it is not the only plausible reading of that phrase. The treaty does not define "the charging document" or provide any language to limit its meaning. For example, while subsection (3)(a) of Article 8 explains that "the warrant or order" must be "issued by a judge, court or other authority competent for this purpose," subsection (3)(b) contains no such limiting language for "the charging document." Also, other parts of the treaty describe individuals who may be extradited in different ways. Specifically, Article 1 refers to individuals "charged with or convicted of an extraditable offense." J.A. 45. Article 8, the section setting forth the required documentation that must accompany an extradition request, refers to individuals "sought for prosecution." J.A. 48. So, while I agree that "charged with" may suggest a formal charge, "sought for prosecution" is broader. It could also be plausibly read—as the extradition court, the first habeas court and then district court did—to include "persons wanted for prosecution by Lithuania, such as Vitkus, who are wanted to stand trial for specific crimes, but for whom a formal charging document akin to the ones used in the United States may not have been issued." Heinemann Aff. at 1. *See Sullivan v. Kidd*, 254 U.S. 433, 439 (1921) ("[T]reaties are to be interpreted upon the principles which govern the interpretation of contracts . . . [and] that all parts of a treaty are to receive a reasonable construction with a view to giving a fair operation to the whole."). In other words, the Secretary's reading is, at the very least, plausible.

37

And when a treaty's language can be plausibly read in more than one way, it should be resolved in favor of extradition. *See Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933) ("[I]f a treaty fairly admits to two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."). Also, the government's interpretation of the meaning that should be given to particular provisions in a treaty is entitled to deference. *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight."); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Baturin v. Comm'r of Internal Revenue*, 31 F.4th 170, 175 n.6 (4th Cir. 2022) ("We usually do defer to the Executive Branch's interpretation of a treaty."); *Yoo v. United States*, 43 F.4th 64, 72 (2d Cir. 2022) ("[W]hile the matter of treaty interpretation is ultimately a question of law for the courts, given the nature of the document and the unique relationships it implicates, the Executive Branch's interpretation of a treaty is entitled to great weight.") (internal quotation marks and citations omitted). And that is particularly true when both parties to the treaty agree on its meaning. *See Abbott*, 560 U.S. at 16 ("In interpreting any treaty, 'the opinion of our sister signatories . . . are entitled to considerable weight.'") (quoting *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999)).

Applying these principles of deference, the district court's denial of Vitkus' motion for a preliminary injunction was not an abuse of discretion. While the treaty could be read

38

to require a formal charging document, it was plausible to read it the way the Secretary urges us to do. And for that reason, Vitkus has failed to meet his burden that he is likely to succeed on the merits at trial. As a result, the district court did not err in denying Vitkus' motion for a preliminary injunction.

The Ninth Circuit recently came to the same conclusion. *See Manrique v. Kolc*, 65 F.4th 1037 (9th Cir. 2023). In *Manrique*, Peru sought to extradite its former President "to face criminal charges for allegedly accepting millions of dollars in bribes during his presidency." *Id.* at 1039. In support of its extradition request, Peru submitted "two Prosecutor's Decisions, documents that summarize the ongoing investigation, and an *Acusación Fiscal*, a document produced at the end of an investigation that lays out the crimes allegedly committed and supporting evidence." *Id.* at 1040. On appeal, the petitioner argued that he could not be extradited because Peru had not submitted a "copy of the charging document." *Id.* at 1043. He insisted, much like Vitkus, that only the formal charging document, an *Orden de Enjuiciamiento*, would suffice. *Id.* But the Ninth Circuit disagreed. It first recognized that the plain language of the treaty did not "mention formal charges or the *Orden de Enjuiciamiento*." *Id.* In addition, the court noted that documents submitted by Peru sufficiently identified the crimes that the petitioner was accused of and summarized the supporting evidence. *Id.* Finally, it recognized that Supreme Court guidance required the treaty to be broadly construed to give effect to the parties' intent and that courts should defer to the Executive Branch's interpretation. *Id.* Accordingly, the Ninth Circuit denied the petitioner's motion to stay his extradition.

39

The Ninth Circuit analyzed language in the extradition treaty between the United States and Peru that is identical to the language we confront today. And it rejected the same argument Vitkus presses before us. In other words, it adopted the Secretary's interpretation of "the charging document." Of course, the Ninth Circuit's decision is not binding on us. But when combined with the prior decisions of the extradition court, the first habeas court and the district court, the Ninth Circuit's decision reinforces my view that the Secretary's interpretation is plausible. I would follow the Ninth Circuit's sound reasoning here.

III.

In conclusion, the Secretary's view that documents submitted by Lithuania satisfy the treaty's charging document requirement is, at the very least, plausible.[4] When that is the case, we must defer to the Executive Branch's interpretation of treaties that it has been charged with negotiating and enforcing. Thus, Vitkus has not met his burden of establishing that he is likely to succeed at trial. And for that reason, the district court did not abuse its discretion in denying Vitkus' motion for a preliminary injunction.

Respectfully, I dissent.

---

[4] Because I conclude that Vitkus has failed to show a likelihood of success on the merits, I need not decide whether he has shown that "he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

40